In re Sharon Mabel Day VOELLER and Gerald Anthony Voeller, Debtors.

FIRST WESTSIDE NATIONAL BANK OF GREAT FALLS, a National Banking Association, Plaintiff,

v.

Sharon Mabel Day VOELLER, Defendant.

Bankruptcy No. 480–00366.
Adv. No. 480–0115.

United States Bankruptcy Court,
D. Montana,
Great Falls Division.

Aug. 12, 1981.

Lon T. Holden, Great Falls, Mont., for plaintiff.

Channing J. Hartelius, Great Falls, Mont., for defendant.

### ORDER DETERMINING DEBT TO BE NONDISCHARGEABLE

ORVILLE GRAY, Bankruptcy Judge.

This matter came on regularly for trial on February 13, 1981, in Great Falls, Montana. At that time, testimony was introduced and exhibits were filed, and counsel have now filed briefs. And, the Court now being fully advised as to the facts of this matter, and as to the applicable law, makes its findings of fact and conclusions of law as set out below.

This case is somewhat different from the usual false financial statement case that comes before this Court. The more common one is where the borrower is a consumer with little or no business experience, and the lender is a small loan company. This case includes more complicated elements in that it is in the nature of a commercial or business transaction. This case also arises under the New Bankruptcy Code (11 U.S.C. § 523(a)(2)(B)). There has not yet been much litigation in this District under the Code on this subject, but there is not a great change in the law from the 1898 Bankruptcy Act. Section 17(a)(2) of the Act is basically the same statute, and the cases interpreting it still generally apply. The discharge remains one of the primary purposes of the Code: to give the honest debtor a "fresh start". On the other hand, not everyone who becomes a "debtor" (formerly a "bankrupt") is entitled to the financial balm of the Code. This basic philosophy is set out in 9 Am.Jur.2d 676, that the right to a discharge is to be liberally construed in favor of the debtor, *but* the discharge is a high privilege, and not to be granted unless all the statutory conditions have been fully met.

In this case, the Court must follow the mandate of Congress and decide within the provisions of 11 U.S.C. § 523(a)(2)(B). The burden is, of course, on the plaintiff to prove all the necessary elements. These five elements as they apply to this case are:

1. That defendant obtained money from the plaintiff.

2. By the use of a *materially false* statement in writing.

3. Respecting her financial condition.

4. Upon which plaintiff *reasonably relied.*

5. And, which debtor published with *intent to deceive.*

Emphasis supplied.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The defendant had been a realtor for some time in Great Falls. She did very well

in her business, was well qualified and was generally considered a "top producer". She got into financial difficulty, however, as a result of an unfortunate relation with an earlier realtor employment situation, and because her husband suffered extended illness. She then accepted employment with Dahlquist Realty Agency. Mrs. Dahlquist was aware of the financial difficulty she was having, and also the fact that Mrs. Voeller's car might be repossessed. The car was essential to her as a real estate salesman. As her broker-employer, Mrs. Dahlquist volunteered her assistance. She discussed the problems with a banker friend, Mr. Joslyn, of the plaintiff bank, on the telephone. Mrs. Dahlquist helped Mrs. Voeller fill out a pencil copy of the bank financial statement form. This was made in conjunction with a rough hand written work sheet of debts (P 15). From these papers they prepared the signed financial statement that was presented to the bank (P 6A). Mrs. Dahlquist testified she considered it a "rough draft" that Mrs. Voeller would redo. It was never signed in Dahlquist's presence. In any case, however, the information was furnished by Voeller and Dahlquist's assistance was as to form, computation, etc. There is a dispute in the testimony as to her exact relationship in the loan application. However, I find that it was limited to assisting Mrs. Voeller and that Mrs. Voeller was responsible for the information she herself supplied. At most, Mrs. Dahlquist was in the position of a friendly adviser, or counsellor, and possibly agent for Mrs. Voeller, but did not in any way act as an independent authority.

I further find from the evidence that is very clear that Mrs. Voeller was an experienced business woman, familiar with the financial intricacies of real estate and other transactions. She frequently was involved in the financing of property in relation to real estate sales. She was somewhat sophisticated in commercial affairs and was clearly not a sheltered, naive housewife.

Defendant secured a loan from plaintiff in the amount of $10,000.00 on December 10, 1979. This loan was later renewed and payments were made on it reducing the present principal amount to $4495.88. There is no dispute as to the first element, that defendant did obtain money from plaintiff, or as to the third element that there was a statement in writing regarding her financial condition.

We now, therefore, come to the matters of contention, whether the statement was *materially false*, and the related question No. 5, whether there was *intent to deceive*.

I find that the statement was "materially false". There was significant difference in both the assets and the debts from the true picture. But, the particular matter on which I place primary emphasis in this determination is in relation to the place known as the "Gore Hill Property". This is listed on the finance statement as real estate owned with a value of $12,000.00, and indicated it has no mortgage or contract balance against it. This property, being about 2½ acres, on Gore Hill, near Great Falls, Montana, was to be purchased from a Mrs. Scarborough. Mrs. Scarborough was a very intimate friend of Mrs. Voeller. She was well aware of the financial troubles. She explained this property was to be sold to Mrs. Voeller on a contract for a deed, dated November 23, 1978, with nothing paid down. The title was never released, the contract was never filed or recorded. Mrs. Scarborough at that time had cancer, and this arrangement was made so that Voeller could pay off the debt in case Mrs. Scarborough died. But, the matter of importance to this case is that Mrs. Voeller had paid nothing down, and it was Mrs. Scarborough's clear testimony that Mrs. Voeller had not paid anything on the contract, did not make a down payment and had not paid one dime on this purchase. She further testified that "as of December 10, 1979, Sharon (Voeller) had no equity in the property".

Mrs. Scarborough was a very impressive witness. She was not subpoenaed and volunteered to come to this trial. In her own words "I am here out of friendship". From her testimony and other evidence, I find that the listing of the "Gore Hill Property"

in the manner it was resulted in a "materially false" statement. This is such a clear variance from the truth, I will not dwell on other material discrepancies, including those in relation to the "homestead property", the automobile, and the note due the Northwest National Bank, and other unreported items.

Was there, then, the requisite *intent to deceive*? I find that there was. Counsel for defendant makes a very impressive argument that the financial statement was the responsibility of Mrs. Dahlquist, as an independent agent, and that Voeller was innocent and ignorant of its contents. But, I find that Mrs. Voeller cannot, in effect, hide behind Mrs. Dahlquist's petticoat. Mrs. Dahlquist assisted her and tried to help one of her employees because she was a good producer. Mrs. Voeller was grateful for this help. But, the fact remains from the evidence, that the information on the financial statement was Voeller's. She furnished it and she signed it and she presented it to the bank. She was knowledgeable as to her own business affairs. She was clearly well aware of the "Gore Hill Property" listing discussed above. Again, the testimony of Mrs. Scarborough is most illuminating. She was present at the Dahlquist Agency at the time the statement was being filled out by Mrs. Voeller and Mrs. Dahlquist. She discussed with both Mrs. Dahlquist and Mrs. Voeller, "about my land", i. e., the listing of the Gore Hill property, and that it should not be included. She testified, as follows:

A. They were talking about the financial deal, and everything, and they were talking about my land, and I said, "You can't put my land down because she hasn't made a payment. She hasn't even made any interest".

Q. Was Sharon standing there when you said that?

A. Yes.

Q. She knew obviously she hadn't paid any money on your property, right?

A. Yes.

She went on to say that in effect a lot of people put down assets even if not true, to get a loan from the bank. She stated that she had not repossessed the 2½ acres, and Voeller had a right to sell it at a profit if she could find a buyer. However, not one dime was paid on it. She went on, as follows:

Q. Let me ask you this question: based on what you told Marge Dahlquist in the presence of Sharon Voeller, that property should not have been shown as an asset owned by Sharon Voeller, is that correct, on the financial statement?

A. Well, it depends on whether you are the giving or receiving end.

Q. I don't understand that. If you told—

A. A lot of people put down something if they're going to borrow from the bank, even if they don't own it 100%. They put that down as an asset.

Q. So what you are saying is that even if it wasn't shown it was alright because a lot of people do it; is that what you're saying?

A. I have been in farming and ranching before, and they have done that. The bankers have said, "Well, put it down".

Q. Well, did that happen here?

A. I don't know. I wasn't over there.

As stated earlier, I find that Mrs. Voeller was an experienced business woman, familiar with commercial and financial affairs and was not a naive and innocent housewife. At most, Mrs. Dahlquist was her agent assisting her at her request. I must assume that Voeller intended the natural consequences of her act and therefore find against her in this fifth element.

I then come to the final element of whether the bank "reasonably relied" on this statement. This is a very close question and is one I have wrestled with for a considerable time. I re-read my notes of the testimony and have had some of the testimony transcribed. I have re-studied the briefs submitted. In reaching my conclusion I place great emphasis on the fact that this defendant was an experienced

business woman, well recognized in her profession, and not the ordinary wage earner, innocent of business knowledge. I also rely heavily on a recent, and well reasoned case from the Bkrtcy. District of Florida, *Flagship Bank of Tampa, Plaintiff, v. Albert M. Davidson and Clarence S. Dick, Defendants*, 6 B.R. 159, 7 BCD 52. This case was decided in September 1980, by Bankruptcy Judge Paskay, who is a recognized scholar in our field. In the light of the foregoing comments, and the following remarks, I am satisfied that the bank has sustained its burden with regard to this element. Accordingly, it is incumbent upon this Court to rule in favor of nondischargeability.

The reluctance I have had in reaching this conclusion is my finding that there was clearly heavy reliance upon the security given. In this case, as differentiated from the *Davidson* case, the bank had an assignment of real estate commissions. This assignment was a potentially favorable type of security and some $5500.00 was actually finally repaid on the loan from that source. In retrospect, it may appear unfortunate that the whole loan was not repaid. At one time, there were sufficient funds available. But, I don't think I can now condemn or fault the bank for allowing Mrs. Voeller part of her commissions for necessary living expenses at that time. If they had relied fully on the assignment, had they collected the whole debt at that time, this case would not have arisen.

But, my decision must deal with "reasonable reliance" on the financial statement. Counsel for the defendant comments in his brief that Mr. Joslyn, the bank officer, testified he relied on Mrs. Voeller's ability to repay based on the assignment. But, he also testified, albeit on redirect, that he relied on the financial statement. I find the bank relied on both. Counsel states several recent and strong cases supporting his position.

But, the fact remains that the payment of the real estate commission was at all times speculative and without assurance it would ever materialize, due to the very nature of the real estate business. Mr. Joslyn was familiar with this type of business, since he was at one time a real estate agent himself. If the proposed sale never materialized, no commissions would be forthcoming. Mr. Joslyn, therefore, required the financial statement so that he could judge her financial condition and have knowledge of other assets to cover the loan in the event the commissions failed to materialize. In fact, as events developed, the $29,000.00 anticipated commission shrunk to some $9,000.00.

The cases cited do not require a hundred percent or sole reliance on the financial statement. The testimony of Mrs. Voeller herself shows that her meeting with Mr. Joslyn was brief; that she took the statement to him, introduced herself and reminded him that Marge (Dahlquist) sent her. But, he did require such a statement and did question her as to the various aspects and made notations. This meeting was similar to the one in the *Davidson* case.

In that case a $10,000.00 loan was granted to the two businessmen. While the bank would not grant a loan to either the corporation or the partnership involved, it would consider a personal loan to Mr. Davidson and Mr. Dick if each would submit a loan application and a financial statement. The entire transaction apparently lasted only about fifteen minutes and the loan officer showed little interest in the financial statement. The Court went on to hold:

"Thus, in order to sustain an action under Sec. 523(a)(2)(B) each element of the Bank's prima facie case must be established. There is no question but that the only element in dispute is whether the Bank could have reasonably relied on both or even one of the Debtor's false financial statements.

According to House Report No. 95–595, 95th Cong. 1st Sess., (1977) at 363, this Section provides 'the creditor must not only have relied on a false statement in writing, the reliance must have been reasonable. This *codifies case law construing this provision.*' (emphasis supplied). Thus, it is clear that reasonable reliance is actually not an additional requirement,

but merely a recognition, or a reaffirmation of what has been established by courts under pre-Code law.

With regard to whether the Bank officer could have reasonably relied on an unsigned statement of a person whom he never saw and had no previous dealings with and which was in fact a copy of a statement dated December 31, 1978, it is clear that the Bank would have acted unreasonably if it had closed the loan without even seeing Mr. Dick and leaving the statement unsigned. The evidence, however, shows that although Mr. Dick did not sign his financial statement until the 12th of March, he did sign it on that date in the presence of the loan officer. Thus, the Bank officer did procure the Debtor's signature and did actually meet the Debtor prior to the time the loan was closed. In this Court's opinion, those steps taken were sufficient to permit reasonable reliance to be inferred, and were also sufficient to remove the taint of unreasonableness, if any, created by the tentative approval on March 9, 1979, of the loan based on an unsigned statement of a person the loan officer had never seen."

I feel that based on the similarity of this case to the *Davidson* case, the bank has met the minimum of requirements under the new code as to the question of "reasonable reliance".

WHEREFORE, IT IS ORDERED:

1. That debt of Sharon Voeller to First Westside National Bank of Great Falls, in amount of $4495.88, is hereby determined to be nondischargeable within this bankruptcy proceeding.

2. That certificate of discharge issue forthwith to the debtor in the normal course of bankruptcy administration, subject only to this debt in the sum of $4495.88.

3. That judgment may issue in favor of plaintiff, First Westside National Bank of Great Falls, in the sum of $4495.88, together with such interest as the laws of the State of Montana allow from December 10, 1979.

4. That no attorneys fees are set at this time but counsel may request, within ten (10) days from date of this order, a hearing for presentation of evidence and argument on that matter for further consideration of the Court.

5. That copy of this order be mailed forthwith to Channing J. Hartelius, Esq., and Lon T. Holden, Esq.