**In re John L. HARMER, Debtor.**

**NORTH PARK CREDIT, Plaintiff.**

v.

**John L. HARMER, Defendant.**

Bankruptcy No. 81C–03791.
Civ. No. 82PC–0158.

United States Bankruptcy Court,
D. Utah.

Oct. 24, 1984.

N. George Daines, Logan, Utah, for plaintiff.

Don B. Allen of Ray, Quinney & Nebeker, Salt Lake City, Utah, for debtor defendant.

## MEMORANDUM OPINION AND ORDER

GLEN E. CLARK, Bankruptcy Judge.

### CASE SUMMARY

This is a civil proceeding to determine the dischargeability of a debt. It is brought pursuant to Section 523(a)(2)(B) of the Code for a determination that the subject debt was incurred when the debtor obtained money through the use of a materially false written statement about the debtor's financial condition on which the plaintiff's assignor relied and which the debtor made or published with the intent to deceive.

### JURISDICTION

This court has jurisdiction over this case by virtue of 28 U.S.C. 157. Moreover, the court finds that this is a "core matter" within the meaning of 28 U.S.C. 157(b)(1), as exemplified in 28 U.S.C. 157(b)(2)(I).

## FACTS AND PROCEDURAL BACKGROUND

On December 30, 1981, debtor, John L. Harmer ("Harmer") filed a voluntary petition under Chapter 7 of the Code, and on February 18, 1982, plaintiff, North Park Credit ("North Park"), commenced this adversary proceeding against Harmer under Section 523 of the Code.

The factual developments leading to this civil proceeding took place over a five year period beginning in August of 1976. At that time the North Park Bank of Commerce ("Bank") had an influential customer named Marvin V. Fish ("Fish"), who recommended Harmer to the Bank as a politically prominent California attorney with an excellent reputation. Fish described Harmer as an attorney, legislator, business and political consultant, former California Lieutenant Governor, and unsuccessful candidate for the office of California Attorney General. Fish then arranged with the Bank's manager, Marvin Steed ("Steed") to meet with Harmer, who wished to borrow from the Bank the sum of $35,000.

Prior to the meeting with Steed, Harmer mailed to the Bank a letter dated July 23, 1976, stating:

> In response to a request by Marvin Fish, I am enclosing for your reference my financial statement.
>
> Please feel free to contact me regarding any questions or requests you may have.
>
> Sincerely,
> /s/ John L. Harmer

Enclosed with this letter were two documents. The first was a November 22, 1974 letter from Jones & Giles, certified public accountants, of San Gabriel, California to Lt. Governor John L. Harmer of Sacramento, California, stating:

> The accompanying statement of assets and liabilities of Mr. and Mrs. John L. Harmer as of November 15, 1974 were not audited by us and accordingly we do not express an opinion on the statement.
>
> Respectfully,
> /s/ Jones & Giles

At the bottom of this same letter of Jones & Giles there was appended the following handwritten note:

> This statement remains basicly [sic] unchanged except that the value of the home has increased as is reflected by the attached real property tax assessment— and the motel is now an operating facility of 75 rooms with an appraised value of $1.64 million.
>
> /s/ John L. Harmer

The second document enclosed with Harmer's July 23 letter was the financial statement dated November 15, 1974, showing Harmer's net worth at $754,750.

On August 4, 1976, a meeting took place between Harmer and Steed. At that time, after a short visit between them, Harmer signed a promissory note, dated August 6, 1976, in the amount of $35,000, made in favor of the Bank. At this meeting, Harmer was asked to provide a more up-to-date financial statement. Notwithstanding this request, the Bank processed the loan and the sum of $35,000 was disbursed to Harmer. At some time thereafter, the Bank assigned this note to North Park Credit, plaintiff here.

Later, Harmer submitted to the Bank a second financial statement, dated August 10, 1976.

After Harmer filed a petition in bankruptcy, North Park brought this civil proceeding claiming that (1) Harmer submitted his August 10, 1976 financial statement for the purpose of obtaining the $35,000 loan of August 4, 1976; (2) that the financial statement on which the plaintiff reasonably relied was materially false and misleading in that it (a) overstated cash actually held, (b) gave misleading and incorrect dates concerning the real estate held by Harmer, (c) omitted the disclosure of notes owed and accounts payable, (d) significantly understated debts, notes payable, and real estate mortgages, and (e) gave a net worth of $754,750 which was totally false.

Harmer denied all the material allegations of the plaintiff's complaint, and asserted in defense that the financial state-

ments together with additional information provided by Harmer to the Bank accurately and correctly reflected his financial condition. On these grounds, Harmer moved for the dismissal of the complaint. That motion was denied, and a trial was held on the merits.

## ISSUE

The sole question presented to the court is whether or not the facts adduced at trial demonstrate, by a clear and convincing standard of evidence, that the debtor obtained money, property, credit, or services by the use of a materially false statement, in writing, respecting the debtor's financial condition, made by the debtor with the intent to deceive, and reasonably relied upon by the plaintiff in advancing to the debtor loan funds in the principle sum of $35,000.

After due consideration, it is the opinion of this court, for the reasons set forth here, that (a) the plaintiff has established its prima facie case for nondischargeability by clear and convincing evidence, (b) the debtor has failed to assert credible defenses, (c) the debtor did, within the purview of Section 523(a)(2)(B), obtain money from the plaintiff's assignor by the use of materially false statements, and (d) the debtor's debt to the plaintiff is not dischargeable in bankruptcy.

## DISCUSSION

Section 523 of the Code provides, in pertinent part, that a discharge does not affect any debt:

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

.   .   .   .   .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money ... or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

11 U.S.C. Section 523(a)(2)(B).

The burden of proof is on the creditor,[1] who must prove his case by a "clear and convincing" standard of evidence.[2] In establishing a prima facie case for determining the dischargeability of a debt under the provision quoted above, the creditor must show that the debtor (1) obtained money, property, credit, or services by the use of a materially false statement, (2) in writing, (3) respecting the debtor's financial condition, (4) made with intent to deceive, and (5) reasonably relied upon by the creditor to advance the money, property, credit or services.[3]

■ The creditor need not prove the element of intent to deceive. This will be presumed to be true once the creditor has carried the burden of persuasion on all the other elements of his prima facie case. At that point, the burden of going forward with evidence on the intent element shifts to the debtor, who by the mere introduction of evidence that rebuts the presumed fact of intent will cause that presumption to disappear.[4]

In this case, there is no question that Harmer submitted to the Bank written financial statements respecting the debtor's financial condition and obtained a $35,000 loan as a result. The questions remaining for disposition are (1) whether either or

1. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Peoples Finance & Thrift Co. of Ogden v. Doman,* 27 Utah 2d 404, 497 P.2d 17 (1972); *In re West,* 21 B.R. 872 (Bky.M.D.Tenn. 1982); *In re McVan,* 21 B.R. 632 (Bky.E.D.Penn. 1982); *In re Magnusson,* 14 B.R. 662 (Bky.E.D. N.Y.1981); *In re Davidson,* 6 B.R. 159 (Bky.M.D. Fla.1980).

2. *Oriel v. Russell,* 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929); *In re Tashman,* 21 B.R. 738 (Bky.D.Vt.1982); *In re Tomeo,* 1 B.R. 673 (Bky. E.D.Penn.1979); *In re Huff,* 1 B.R. 354 at 357, n. 2 (Bky.D.Utah 1979).

3. *In re Valley,* 21 B.R. 674 (Bky.D.Mass.1982).

4. *In re Buckwalter,* 18 B.R. 327 (Bky.E.D.Pa. 1982); *In re Magnusson, supra.*

both of the financial statements were materially false, (2) whether either or both of them were reasonably relied upon by the lender to advance money, property, credit, or services, and (3) whether either or both of them were submitted by the debtor with the intent to deceive the creditor.

### The Materially False Element

Courts have attempted to set forth a meaningful definition of the term "materially false" as it is used in Section 523(a)(2)(B). In a number of cases, they have interpreted "materiality" in terms of dollar amounts.[5] In one case, "materially false" was said to mean a "substantial and important untruth";[6] in another case, it was said to mean "actually false," or simply "false" or "untrue";[7] and in yet another case, "materially false" was said to mean any discrepancy between the debtor's actual financial status and the picture of it painted by his financial statement.[8] In a long line of cases, it has been held that the omission, concealment, or understatement of any of the debtor's liabilities constitutes a "materially false" statement.[9]

In this case, the court was presented with an extreme case of material falsity. The financial statement dated November 15, 1974, which Harmer submitted to the Bank prior to the date the loan was made, listed assets of $1,959,450, liabilities of $1,204,700, and a net worth of $754,750. Harmer advised the lender that this was "basicly [sic]" true. But, in fact, Harmer's net worth at the time was, at best, only $74,000.

The second financial statement, dated August 10, 1976, showed a decline in net worth from almost three-quarters of a million dollars to $353,000, with assets totaling $1,589,000, and liabilities totaling $1,236,000. However, in his testimony at trial, Harmer contradicted his second financial statement, stating that his net worth was as follows:

| Case | $ 3,000 |
|------|---------|
| Home Equity | 70,000 |
| Motel Equity | 55,000 |
| Stock | 40,000 |
| Notes | 21,000 |
| Total | 189,000 |

Moreover, the evidence adduced at trial clearly and convincingly showed that Harmer had omitted from both financial statements judgment liens against his residence in the amount of $115,000. When these additional judgments are subtracted from his claimed net worth of $189,000, it leaves Harmer with an actual net worth of only $74,000. The failure to disclose unsatisfied judgment liens deprived the lender of material information that would have served as an important danger signal.

In addition to this evidence of materiality, there must be added the evidence provided by Steed that, had the lender known the truth, the loan would not have been made. This testimony was not shaken in cross-examination, where Steed further asserted that he made the maximum loan possible based upon Harmer's ability to service the debts listed in his financial statement of November 1974.

The difference between the debtor's actual net worth of $74,000 and the net worth adducible from either of the two financial statements ($754,750 or $189,000) is so great that, when coupled with the lender's clear and convincing testimony that no loan would have been made had the truth been known, the court can reach no other conclusion than that both financial statements submitted by Harmer to the Bank were materially false under any of the legal definitions set forth above.

5. *See, e.g., Clancy v. First National Bank of Colorado Springs,* 408 F.2d 899 (10th Cir.1969), *cert. denied,* 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969); and *In re Voeller,* 14 B.R. 857 (Bky. D.Mont.1981).

6. *In re Tomeo, supra.*

7. *In re Drewett,* 13 B.R. 877 (Bky.E.D.Pa.1981).

8. *In re Valley, supra.*

9. *In re Norton,* 11 B.R. 141 (Bky.D.Vt.1980); *see also,* 3 COLLIER ON BANKRUPTCY, ¶ 523–09, at 523–51 n. 5 (15th Ed.1984).

### The Reasonable Reliance Element

Harmer denies the plaintiff's claim that plaintiff's assignor, the Bank, reasonably relied upon his false financial statements. He claims that the Bank (1) did not really care about these statements nor the accuracy of the information they contained since the Bank knew they were outdated, (2) had been informed that the statement was not entirely accurate, and (3) was granting the loan to Harmer in order to obtain deposits of approximately $600,000 from Fish, a person of reputation whom the Bank was anxious to satisfy. These assertions the court must reject in light of the facts presented at trial.

Harmer mailed the financial statement dated November of 1974 to the Bank, along with a cover letter dated July 23, 1976. On that financial statement there appeared a handwritten note of Harmer's, dated July 27, 1976, stating:

> This statement remains basicly [sic] unchanged except that the value of the home has increased as is reflected by the attached real property tax assessment— and the motel is now an operating facility of 75 rooms with an appraised value of $1.64 million.
>
> /s/ John L. Harmer

Harmer testified that the Bank's request for this financial statement was merely perfunctory.

Steed, on the other hand, testified that, before a loan could be made, the Bank required a properly completed financial statement. On this point, Steed withstood searching and vigorous cross-examination by Harmer's attorney and remained firm and consistent in his response that, as agent for the Bank, he relied upon the financial statement of November 1974 and the net worth set forth therein.

Plaintiff put into evidence the 1974 statement and offered testimony that the liabilities section of the statement contained the most significant information in the processing of a loan. That having been stated, the burden of proving that the plaintiff did not in fact rely upon this information shifted to the debtor. But the debtor did not carry that burden.

Although the Bank asked for and received an additional financial statement, dated August 6, 1976, on the date the loan was made (August 4, 1976), the Bank possessed no knowledge of Harmer's financial condition, other than what Harmer told Steed and what Harmer asserted in the 1974 statement, which Harmer claimed was "basicly [sic] unchanged", in spite of the fact that Harmer had incurred political debts not mentioned in either statement.

██ In order to prove the element of reliance, the law does not require a plaintiff to prove that the false financial statement was the sole object upon which the plaintiff relied, so long as it is one of the items upon which the creditor relied in making the loan.[10] Thus, even partial re-

---

10. *Bazemore v. Stehling,* 396 F.2d 701, 703 (5th Cir.1968); *Wylie v. Ward,* 292 F.2d 590, 592 n. 5 (9th Cir.1961); *Rogers v. Gardner,* 226 F.2d 864, 867 (9th Cir.1955); *Banks v. Siegel,* 181 F.2d 309, 310 (4th Cir.1950) (where the court decided the discovery of omitted debts makes reliance on the statement seem questionable, but partial reliance suffices); *In re Clancy,* 279 F.Supp. 820, 822 (D.Colo.1968) *aff'd* 408 F.2d 899 (10th Cir.), *cert. denied,* 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969) (where the debtor contended that the bank had not relied upon a false financial statement because bank officials knew the debtor was married to a wealthy woman and looked to her for repayment, and the court agreed that the bank had relied upon these facts, but that the law does not require a lender to rely solely upon a financial statement in order for the reliance element to be met in fraud cases); *In re Bernstein,* 197 F.2d 378 (7th Cir.1952) (where the court held that proof that the lender took security for a loan is not proof that the lender did not reasonably rely upon representations of the debtor); *Utah Finance Co. of Salt Lake v. Patrick,* 16 Utah 2d 195, 398 P.2d 200 (1965) (where the court held that the mere fact that a lender conducts an investigation of the debtor does not prove that the lender did not reasonably rely upon debtor's information); and *Associates Consumer Finance Co. v. Crapo,* 21 Mich.App. 195, 175 N.W.2d 315 (1970) (where the court held that a lender had reasonably relied upon the debtor's statements even though the first loan application was turned down after an investigation showed unfavorable information and, the next day, after debtor had submitted a false financial statement, a loan was approved).

liance on a false financial statement is sufficient to render a debt nondischargeable in bankruptcy.[11] Steed testified that the Bank relied upon the financial statement in approving Harmer's loan. The court accepts this statement because there was, other than Harmer's own reaffirming information given at the interview, no other information upon which the Bank could rely.

The question that remains, then, is whether or not the Bank's reliance, under the circumstances of this case, was reasonable.

Section 523(a)(2) of the Code is the successor to Section 17(a)(2) of the Bankruptcy Act.[12] In enacting the Code, Congress modified the statutory language of this provision by inserting the word "reasonably" before the word "relied," making it "explicit that the creditor must not only have relied on the false statement in writing, but the reliance must have been reasonable." [13]

In doing this, Congress apparently did not intend to add a new element to the creditor's burden in proving nondischargeability. The committee reports of both the House and the Senate state that the reasonableness requirement now made express in Section 523(a)(2)(B) was a codification of the trend in the case law of implying a reasonableness requirement under Section 17(a)(2) of the Act.[14]

A review of decided cases reveals three situations in which courts generally conclude that the creditor's reliance on the financial statement is unreasonable. The first situation occurs when the creditor knows at the outset that the information listed on the financial statement is not accurate.[15] The second situation occurs when the financial statement does not contain sufficient information to portray realistically the debtor's financial status.[16] And the third situation occurs when the creditor's investigation suggests that the financial statement is false or incomplete, rendering reliance thereon unreasonable.[17] A fourth and emerging view is that a creditor's failure to verify any of the information contained in a financial statement renders reliance on that statement unreasonable.[18]

Although the Bankruptcy Code amended the Act's discharge language to include a statutory reasonableness requirement, Congress did not provide any definitional language. Accordingly, the courts must attempt to strike a balance between the legitimate, competing interests of creditors seeking to establish nondischargeability and the interests of debtors seeking to have their debts discharged within 'the framework of the bankruptcy law. In so doing, the courts must first ascertain the Congressional purpose underlying both the discharge and the false financial statement exception thereto.

---

11. *In re Sewell,* 361 F.Supp. 516, 518 (S.D.Ga. 1973); *In re Smith,* 2 B.R. 276, 279 (Bky.E.D.Va. 1980); *In re Baiata,* 12 B.R. 813 (Bky.E.D.N.Y. 1981).

12. 11 U.S.C. 35(a)(2) (1976).

13. 3 COLLIER ON BANKRUPTCY, ¶ 423.09(4) at 523-59 (15th Ed.1984).

14. S.Rep. No. 989, 15th Cong., 2d Sess. 78 (1978); reprinted in (1978) U.S.Code Cong. & Admin.News 5787, 5864; H.Rep. No. 595, 95th Cong., 1st Sess. 130-31, 364 (1977); reprinted in (1978) U.S.Code Cong. & Admin.News 5963, 6091-92, 6320.

15. *Swint v. Robins Federal Credit Union,* 415 F.2d 179, 184 (5th Cir.1969); and *In re Houk,* 17 B.R. 192, 195-96 (Bky.D.S.D.1982).

16. *In re Magnusson, supra,* at 668-69, n. 1.

17. *In re Smith, supra* at 279.

18. *In re Breen,* 13 B.R. 965 (Bky.S.D.Oh.1981) (where the debtor's financial statement failed to disclose a recent mortgage on real property and the creditor failed to investigate the debtor's credit rating, his business, and the lien status of his property; the court held the creditor's reliance on the financial statement to be unreasonable) *see contra, East Providence Credit Union v. Harpootian,* 108 R.I. 219, 273 A.2d 852, 855 (1971) (where the court held that the creditor had reasonably relied upon the debtor's financial statement in spite of its failure to investigate whether or not the debtor had any unlisted indebtedness).

The principle purpose of the bankruptcy law, generally, and the discharge provisions, in particular, is to provide the "honest but unfortunate" debtor with "a new opportunity in life and a clear field for future effort."[19] Nevertheless, because exceptions to discharge can prevent such a result they are to be construed liberally in favor of the debtor and strictly against the creditor.[20]

One commentator has noted:

Since the purpose of the exception is to protect creditors who are actually misled by fraudulent statements of debtors, the requirement that reliance be reasonable is sensible. A creditor who ignores available information, or who fails to seek information from sources that are commonly used, should not be heard to complain about the debtor's fraud. It is the creditor's failing to comport with normal business practices, not the debtor's fraud, that is the true cause of the loss.[21]

■ In the opinion of this court, the reasonableness of a creditor's reliance on a financial statement should be judged by comparing the creditor's actual conduct in light of its own normal business practices and that of its industry in light of the surrounding circumstances existing at the time the application for loan was made.

■ In this case, the plaintiff called as witnesses the Bank employees who took the Harmer loan application as well as the Bank officer who approved the loan. These witnesses established that Harmer's November 1974 financial statement was received by mail. Thereafter, Harmer met with Steed at the Bank on August 4, 1976, at which time Harmer filled out the loan application, signed the promissory note, and the loan was made. The bank officer not only procured Harmer's signature, but he met with Harmer and interviewed him, discussing his financial statement with him and asking him for an updated version. This was the Bank's normal business practice in light of the recommendation it had received from Fish and in light of the apparent financial strength of Harmer. Under these circumstances, to hold as negligent the Bank's failure to discover the California judgment liens, for example, would unduly restrict availability of credit to new residents of this state. In view of Harmer's background and experience the Bank was reasonable in relying upon what Harmer represented as true. Harmer's offhand remarks, about campaign debts which he did not expect to be required to pay, did not require the Bank to investigate whether or not those debts had been reduced to judgment against Harmer in California. Indeed, his reference to these judgments as "contingent" liabilities, without more explanation, was blatant fraud under these circumstances.

■ Reliance on a financial statement need not be proved by direct testimony; it is enough if the evidence demonstrates that a financial statement was supplied in support of a loan application.[22] For all these reasons, this court concludes that in relying upon Harmer's financial statement, the Bank acted reasonably within the meaning of Section 523(a)(2)(B).

**The Intent Element**

■ Section 523(a)(2) now contains an express requirement that the financial statement be made with the intent to deceive. Given that the creditor has proved all other required elements of his prima facie case,

**19.** *Brown v. Felson,* 442 U.S. 127, 128, 99 S.Ct. 2205, 2207, 60 L.Ed.2d 767 (1979), *quoting, Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

**20.** *Gleason v. Thaw, supra,* 236 U.S. at 562, 35 S.Ct. at 289, 59 L.Ed. 717; *Roberts v. W.P. Ford & Sons, Inc.,* 169 F.2d 151, 152 (4th Cir.1948); *Johnston v. Johnston,* 63 F.2d 24, 26 (4th Cir. 1933); *In re Paley,* 8 B.R. 466, 468 (Bky.E.D.N.Y. 1981).

**21.** Zaretsky, "The Fraud Exception to Discharge Under the New Bankruptcy Code," 53 AM.BKY. L.J. 253, 262 (1979).

**22.** *Industrial Bank of Commerce v. Bissell,* 219 F.2d 624, 626 (2nd Cir.1955), *cited with approval in MAC Loan Plan, Inc. v. Crane,* 4 Conn.Cir. 29, 225 A.2d 33 (1966).

the element of intent will be presumed and will not be defeated by the mere testimony of the debtor that he really intended to deceive no one.

■ A false representation knowingly made to induce a loan has been held to create a presumption of intent on the basis of the ancient legal concept that one is presumed to intend the natural consequences of his acts.[23] Obtaining credit by a materially false financial statement will prevent a discharge in bankruptcy if the debtor either (1) had actual knowledge of the falsity of the statement or (2) demonstrated a reckless indifference to the accuracy of the facts stated therein.[24]

In the case of *In the Matter of Bardwell*, 610 F.2d 228 (5th Cir.1980), the court stated:

> On appeal from the bankruptcy court, the district court applied the correct rules of law. Obtaining credit by a materially false financial statement will prevent bankruptcy discharge if the bankrupt either had actual knowledge of the falsity of the statement or demonstrated reckless indifference to the accuracy of the facts stated therein.[25]

■ It is not enough for the evidence to show merely that the debtor should have known that his statement was false or that his false representation or false financial statement was the product of his negligence.[26] The evidence must clearly and convincingly demonstrate either (1) that the debtor *knew* that his financial statement was false[27] or (2) that the debtor's statement was made with a reckless indifference to the accuracy of the facts contained therein.[28]

■ A finding of an "intent to deceive" is a finding of fact relating to a subjective state of mind wherein the debtor's credibility is an important factor.[29] Proof of fraudulent intent may be inferred from the surrounding circumstances.[30] Moreover, intent to deceive may be inferred from a knowingly made false statement.[31] The Ninth Circuit has stressed the need for a rather specific intent and noted, further, that exceptions to a discharge in bankruptcy are subject to the rule of strict, literal construction.[32] The Tenth Circuit, however, has held that if a debtor is fully aware of loans that were not disclosed on a financial statement and further paints a "rather sunny" picture of his financial condition when in fact he is hopelessly insolvent, there is intentional deception.[33]

■ In this case, the debtor testified that the financial statements were not made with any intent to deceive. But since this testimony was not corroborated, it will not overcome the presumption of intent to deceive established by the plaintiff's evidence in the case.[34]

23. *In re Voeller, supra.*

24. *In re Bardwell,* 610 F.2d 228, 229 (5th Cir. 1980), *in accord, In re Barrett,* 2 B.R. 296, 298 (Bky.E.D.Pa.1980).

25. *See also, In re Barrett,* 2 B.R. 296 at 298 (Bky.E.D.Penn.1980); *contra, cf. In re Valley,* 21 B.R. 674 at 679 (Bky.D.Mass.1982).

26. *Forsyth v. Vehmeyer,* 177 U.S. 177, 20 S.Ct. 623, 44 L.Ed. 723 (1900); *Wright v. Lubinko,* 515 F.2d 260 (9th Cir.1975); *In re Norton,* 11 B.R. 141 (D.Vt.1980).

27. *Bullis v. O'Beirne,* 195 U.S. 606, 25 S.Ct. 118, 49 L.Ed. 340 (1904); *In re Clancy,* 408 F.2d 899 (10th Cir.1969).

28. *In re Bardwell, supra; In re Schnore,* 13 B.R. 249 (W.D.Wis.1981); *In re Firestone,* 26 B.R. 706 (S.D.Fla.1982).

29. *In re McGrath,* 7 B.R. 496, 498 (S.D.N.Y. 1980).

30. *In re Rickey,* 8 B.R. 860 (Bky.M.D.Fla.1981); *In re Graham,* 11 B.R. 701 (Bky.D.Conn.1981); *In re Drewett, supra.*

31. *In re Brewood,* 15 B.R. 211, 8 B.C.D. 483 (Bky.D.Kan.1981).

32. *In re Taylor,* 514 F.2d 1370 (9th Cir.1975).

33. *In re Clancy,* 408 F.2d 899 (10th Cir.1969).

34. *See* 3 COLLIER ON BANKRUPTCY, ¶ 523–09 at 523–61 (15th Ed.1984); *In re Rosenfield,* 1 F.Supp. 924 (D.C.N.Y.1932); *In re Monsch,* 18 F.Supp. 913 (D.C.Ky.1937).

That evidence reveals that Harmer has an extensive business and financial background and that both financial statements were materially false. Considering the knowledgeability of the debtor, the large amount of the omission ($115,000), and the nature of the circumstance, it is clear that Harmer (1) knew the significance and importance of the accuracy of financial statements submitted by a prospective borrower to this lender; (2) knew that a lender generally acts on the information contained in such a financial statement; (3) intended the Bank in this case to believe in and rely upon the accuracy of the information contained in his November 1974 financial statement, as evidenced from his own handwritten note, in which he asserted the accuracy of the statement, with the exception of certain minor particulars; (4) deliberately intended for his financial statements to mislead the Bank; and (5) knew that had he fully disclosed the true extent of his liabilities he would not have obtained the loan.

### CONCLUSION

The court concludes that Harmer was not an innocent, unfortunate debtor. He was, instead, an experienced businessman and lawyer, who knew that his actions amounted to the very wrongdoing described in Section 523(a)(2)(B) of the Code, and thereby incurred a debt that cannot now be discharged under the bankruptcy law. This conclusion is, in part, predicated upon this court's observation of Harmer's demeanor on the witness stand and of his evasive, incomplete, and unbelievable answers. There is no evidence in the record that would induce this court to take seriously Harmer's contention that his financial statements were but a formality and that the Bank gave him a loan of $35,000 because it was anxious to make Fish happy. Nor did Harmer ever satisfactorily explain (1) the discrepancy between his first and second financial statements, (2) the discrepancy between his handwritten note on the first financial statement and

his later testimony of his net worth, or (3) the omission of $115,000 in judgment liens.

In this case, the plaintiff has clearly carried its burden of proof under Bankruptcy Rule 407, pursuant to which this case was tried. The debtor obtained money from the Bank by the use of a materially false statement made in writing, submitted to the Bank with the intent to deceive, and reasonably relied upon by the Bank to its detriment. The plaintiff, in this case, as the assignee of the Bank is entitled to raise in this civil proceeding all the same claims and defenses that would have been those of the assignor Bank.[35] For these reasons, the debt owed by John L. Harmer to the plaintiff is hereby determined to be nondischargeable within the meaning of Section 523(a)(2)(B) of the Bankruptcy Code.

---

**35.** *Offshore Logistics Services, Inc. v. Mutual Marine Office, Inc.,* 462 F.Supp. 485 (D.C.La.1978); *Lynch v. MacDonald,* 12 Utah 2d 427, 367 P.2d 464 (1962).