**In re Robert W. KIDD, Debtor.**

**AVCO FINANCIAL SERVICES OF BILLINGS, Plaintiff,**

v.

**Robert W. KIDD, Defendant.**

**Bankruptcy No. 97–42053–7.
Adversary No. 97/00102.**

United States Bankruptcy Court,
D. Montana.

March 23, 1998.

Lewis K. Smith, Smith Law Firm, Helena, MT, for Plaintiff.

Scott M. Radford, Great Falls, MT, for Defendant.

### ORDER

JOHN L. PETERSON, Chief Judge.

Debtor Robert W. Kidd ("Kidd") filed a voluntary Chapter 7 bankruptcy petition on August 6, 1997. On October 16, 1997, Plaintiff AVCO Financial Services of Billings ("AVCO") filed an adversary complaint against Kidd seeking to except from discharge, pursuant to 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(6), the sum of $6,808.00. Kidd filed a timely answer to AVCO's complaint on October 20, 1997, denying each and every

allegation contained in AVCO's Complaint and requesting judgment in his favor along with reasonable attorney's fees and costs pursuant to 11 U.S.C. § 523(d).[1]

Subsequently, after due notice, trial was held December 18, 1997, at Great Falls where Lewis K. Smith appeared on behalf of AVCO and Scott M. Radford appeared on behalf of Kidd. In addition, the Chapter 7 Trustee appeared, Kidd, Valerie St. Clair ("Valerie")—an AVCO Branch Manager— and Jared DiAddegio ("Jared")—a former loan officer of AVCO—testified and Exhibits 1–4 were introduced into evidence without objection. At the close of trial, the Court granted the parties ten days to file memoranda in support of their respective positions and took the matter under advisement. Each party has now filed their respective memoranda. Thus, the Court deems the record closed and the matter is ready for decision. After considering the testimony presented at trial, and after reviewing the record and applicable law, the Court finds for Kidd.

### I

In January and April, 1994, Kidd and Jeanne F. Kidd ("Jeanne")—Kidd's former spouse—obtained two loans from AVCO and gave as security for the loans, a 300 Winchester Magnum, 30.06 Savage Rifle, bench weight lifting set, Magnavox television, Sharp VCR and four pieces of art. Thereafter, Jeanne and Kidd separated and pursuant to the parties' Decree of Dissolution entered October 13, 1994, which incorporated a Stipulation dated September 22, 1994, Kidd received the VCR and two of the four pieces of art while Jeanne received "[a]ll furnishings of the family home."[2] The parties also agreed that Kidd would be responsible for and would hold Jeanne harmless for the two AVCO loans.

---

1. Kidd, in his answer, included a request for reimbursement of fees pursuant to 11 U.S.C. § 523(d). However, neither party raised the issue at trial. In addition, Kidd did not address the issue in his post-trial memorandum which was filed on January 2, 1998. Thus, the Court deems the matter waived.

2. From the evidence and testimony at trial, it appears that the Magnavox television, two of the four pieces of art and the bench weight lifting set were included among the "furnishings of the family home."

In August or September of 1996, almost two years after Kidd and Jeanne separated and after considerable prompting by Jeanne, Kidd finally contacted AVCO seeking to consolidate the two obligations and to remove Jeanne's name from the accounts. During this same time. Jeanne also contacted AVCO wanting to know if her name had been removed from the accounts and to verify that Kidd was making the monthly payments on the joint obligations. In addition, Valerie testified that Jeanne had telephoned AVCO in the fall of 1995 to close the couple's revolving line of credit—one of the two AVCO obligations which Kidd assumed pursuant to the Decree of Dissolution.

Jared was the AVCO employee who received Kidd's telephone call in the fall of 1996 and proceeded to write a new loan for Kidd. Jared ran a credit report on Kidd and also reviewed Kidd and Jeanne's previous loan files. Jared then filled out a new loan application for Kidd individually based upon the information in the previous loan files and on the new credit report. When Kidd arrived at AVCO's office, Kidd provided, in his own handwriting, a list of collateral he was pledging as security, which included all the security listed in Kidd and Jeanne's previous loan documents [3] along with an RCA 18″ satellite dish. Kidd and Jared then reviewed the loan documents together and Kidd signed the Loan Application, the security agreement, including Schedule A, and the FS–1.

Kidd testified that while he and Jared were reviewing the loan documents, Kidd advised Jared that some of the items of collateral listed in the loan application were no longer in his possession as Jeanne had received some of the items in the divorce. Jared testified that he could not remember such a conversation. Jared is no longer employed by AVCO and appeared pursuant to a subpoena. Thus, the Court finds Jared's testimony credible. However, Kidd's testimony was equally credible and since Jared did not unequivocally contradict Kidd's testimony, the Court finds that AVCO was aware, through Jared, that some of the items of collateral, which were merely transferred from Jeanne and Kidd's loan documents to the 1996 loan documents, were awarded to Jeanne in the divorce.

Kidd signed the loan documents and they were then presented to Valerie for review and approval. Valerie testified that she reviewed the loan documents and based upon Kidd's good credit, Kidd's past loan history and on the large value of collateral, Valerie approved the loan. Thus, Kidd received a check for twenty-five cents, Jeanne's name was removed from the obligations and Kidd now had one loan payment instead of two.

In addition to the foregoing, the Schedule of Insured Personal Property, Exhibit 3, contained the following language:

> I/We hereby certify that I am/we are the sole owner(s) of the property listed above, free and clear of any liens, claims, mortgages, attachments or offsets, of any nature whatsoever, of the property described above.

> I/We further certify that property listed and described above is located at my/our address set forth on the security agreement.

The FS–1 also contained, on the back page, the following:

> I will not remove the property from the state, or sell or transfer the property without AVCO's written consent.

Despite the foregoing language, Kidd testified that the 300 Winchester Magnum, and 30.06 Savage Rifle were in his ex-step sons' possession at the time he signed the 1996 loan application. Kidd also testified that in April or May of 1997, Kidd gave to his then girlfriend, Nicole, the VCR and the two prints which he received in the divorce. Kidd also gave Nicole the RCA satellite dish. Thus, Kidd no longer has any of the collateral which he pledged as security for the consolidated AVCO loan, prompting AVCO to file the instant adversary proceeding.

---

**3.** Although Kidd pledged this property as collateral for the new loan, Jeanne had been awarded the bench weight lifting set, the Magnavox televi-sion and two of four works of art in the couple's 1994 Decree of Dissolution.

## II

This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This is a core proceeding for purposes of § 157(b)(1). The burden falls on the creditor to prove the elements of its non-dischargeability claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) ("we hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."). A creditor's burden, in conjunction with the "fresh start" policy of the Bankruptcy Code, creates a sizeable obstacle for creditors to overcome in order to prevail on a non-dischargeability complaint. As the Ninth Circuit Court of appeals stated:

> One of the fundamental policies of the Bankruptcy Code is the fresh start afforded debtors through the discharge of their debts. *In re Devers*, 759 F.2d 751, 754–55 (9th Cir.1985). In order to effectuate the fresh start policy, exceptions to discharge should be strictly construed against an objecting creditor and in favor of the debtor. *In re Klapp*, 706 F.2d 998, 999 (9th Cir. 1983).

*Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir.1992).

## III

### a. 11 U.S.C. § 523(a)(2)(B).

■ The Ninth Circuit Court of Appeal in *Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani)*, 967 F.2d 302, (9th Cir.1992), set forth the elements of an action based upon § 523(a)(2)(B) [4], requiring:

(1) a representation of fact by the debtor,

(2) that was material,

(3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,

(5) upon which the creditor relied,

(6) that the creditor's reliance was reasonable,

(7) that damage proximately resulted from the misrepresentation.

*Siriani*, at 304.

■ On the issue of materiality, a financial statement that leaves "any discrepancy" between the overall impression left by the statement and the endorser's true financial status gives rise to a material falsehood for the purposes of § 523(a)(2)(B). *North Park Credit v. Harmer (In re Harmer)*, 61 B.R. 1, 5 (Bankr.D.Utah 1984) (citing cases); *accord*, *Texas Am. Bank, Tyler, N.A. v. Barron (In re Barron)*, 126 B.R. 255 (Bankr.E.D.Texas 1991) (citing cases). A "long line of cases" has held that in a personal financial statement, the "omission, concealment, or understatement of any of [a] debtor's material liabilities constitutes a 'materially false' statement." *Harmer*, 61 B.R. at 5.

■ Moreover, even if a debtor does not know of inaccuracies contained in a written financial statement, this Court has held that reckless disregard for the truth satisfies the knowledge element of § 523 and its predecessor. *Baker v. Duneman (In re Duneman)*, 12 Mont. B.R. 253, 259 (1993). "Gross recklessness to the truth also satisfies the fourth ... element of intention of deceiving." *Id.* (citing *Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir.1986)).

■ While the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), adopted justifiable reliance as the appropriate standard under § 523(a)(2)(A), Congress has expressly stated that a creditor's reliance under § 523(a)(2)(B) must be reasonable. The reasonable reliance standard differs from the

---

**4.** Section 523(a)(2)(B) reads:

A discharge under section 727, 1141, 1128(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor for any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

justifiable standard in that the inquiry regarding the justifiable standard:

> [W]ill thus focus on whether the falsity of the representation was or should have been readily apparent to the individual to whom it was made. This is a less exacting standard than "reasonable" reliance, which would focus on whether reliance would have been reasonable to the hypothetical average person.

4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY, § 523.08[1][d] (15th ed.1997).

In *Field,* the Supreme Court reasoned that the more exacting "reasonable" reliance standard in § 523(a)(2)(B) was "tied to the peculiar potential of financial statements to be misused not just by debtors, but by creditors who know their bankruptcy law." The Supreme Court completed its reasoning:

> The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.

*Field,* 516 U.S. at 76–77, 116 S.Ct. at 447.

### b. 11 U.S.C. § 523(a)(6).

■ Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Ninth Circuit Court of appeals has held that injury to property under § 523(a)(6) "includes the conversion of property subject to a creditor's security interest." *Riso,* 978 F.2d at 1154. However, as previously noted, the burden falls on the creditor to prove that a conversion was both willful and malicious by a preponderance of the evidence. *Grogan,* 498 U.S. at 291, 111 S.Ct. at 661.

Prior to a recent United States Supreme Court decision, there was a split among the Circuits concerning what constituted "willful and malicious" conduct under § 523(a)(6). Many courts, including the Ninth Circuit Court of Appeals found that the § 523(a)(6) "willful and malicious injury" exception to discharge referred to "an intentional act which causes injury." *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini),* 780 F.2d 1440, 1442 (9th Cir.1986).

In *Cecchini,* the Ninth Circuit rejected the holdings of both the trial court and the Bankruptcy Appellate Panel ("BAP"), both of which followed the stricter line of authority requiring "that intent to injure a creditor [as opposed to an intentional act which results in injury] is a necessary element of § 523(a)(6)." *Id.* In adopting a "looser" or "less strict" standard, the Ninth Circuit held that "[w]hen a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *Id.* at 1443.

In *Tiger v. Speerstra (In re Speerstra),* 12 Mont.B.R. 281 (Bankr.Mont.1993), this Court recognized that willful and malicious conduct is conduct that is intentional and deliberate and over which the debtor exercises meaningful control, "as opposed to unintentional or accidental conduct." *Id.* at 287 (quoting *Borg–Warner Acceptance Corp. v. Littleton (In re Littleton),* 106 B.R. 632, 637 (9th Cir. BAP 1989)). *See also Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) ("a wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice."). Nevertheless, relying on the Ninth Circuit Court of Appeal's holding in *Cecchini,* this Court, in *AVCO Financial Services v. Lucas (In re Lucas),* 15 Mont.B.R. 447 (Bankr.Mont.1996) determined that the willful and malicious injury exception to discharge under § 523(a)(6) encompassed deliberate or intentional acts that lead to injury, such as the intentional disposition of collateral.

The Supreme Court, however, recently resolved the inter-Circuit conflict and in doing

so, has overruled *Cecchini* and its progeny.[5] *Kawaauhau v. Geiger*, —— U.S. ——, 118 S.Ct. 974, —— L.Ed.2d —— (1998), *aff'g Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848 (8th Cir.1997). In *Kawaauhau,* the petitioners sought to have their medical malpractice award against the debtor/doctor declared non-dischargeable under § 523(a)(6). In that case, the Supreme Court held that the § 523(a)(6) "willful and malicious injury" exception to discharge is limited to intentional torts and does not encompass mere negligent or reckless acts. *Kawaauhau*, —— U.S. at ——————, 118 S.Ct. at 976–77 ("[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."). Thus, the petitioners' medical malpractice claim was dischargeable under § 523(a)(6) despite the fact that the debtor/doctor intentionally rendered inadequate medical care.

The decision in *Kawaauhau* dealt with medical malpractice. It did not, however, address the applicability of § 523(a)(6) in the context of secured transactions. Therefore, this Court must now determine the parameters of § 523(a)(6) in the context a collateral conversion claim. The problem with conversion cases such as *Lucas* and the instant case is that rarely are the debtors acting out of a desire to injure the creditors, even though the injury to the creditor, although not desired, is almost always substantially certain to result form a debtor's actions. Thus, the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is the result of a negligent or reckless tort—but not willful and malicious.

The Third Circuit Court of Appeals, in *Conte v. Gautam (In re Conte)*, 33 F.3d 303 (3rd Cir.1994) addressed the fine differentiation between reckless or negligent torts and intentional torts:

All reckless acts involve an intentional act that is wrong (because it is reckless) and that is significantly likely to lead to injury.

For an act to be reckless "it is enough that [the actor] realizes or, from facts which he knows, *should realize* that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless." *Restatement (Second) of Torts* § 500, Cmt. f (1965). *See also* Prosser & Keeton, *supra* § 8 at 36. Thus, when Congress required more than recklessness for nondischargeability, it required that the debtor have engaged in conduct more culpable than taking a deliberate action that had a high probability of producing harm. This result is also supported by the statutory language under which "willful" modifies injury; for an injury to be willful it surely must be more than a highly likely but unintended result of the debtor's action. Rather, for the injury to have been "willed" by the debtor, it must at least have been substantially certain to result from the debtor's act.

\* \* \* \* \* \*

The Congressional Committee reports which stated that to be "willful and malicious" an action must be more than reckless also stated that " 'willful' means deliberate or intentional.' " *See supra* at 5. Although it would be plausible to argue that an injury is intentional only if the actor desired to cause the injury, under the common law "[t]he word 'intent ... denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.' " *Restatement (Second) of Torts* § 8A (1979) (emphasis added).

Intent is not ... limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses

---

5. This Court's holding in *Lucas* was based in large part on *Cecchini*, thus, to the extent the holding in *Lucas* suggests that a less strict or looser standard is intended, it is overruled.

the character of intent and becomes mere recklessness . . .

*Id.* at § 8A, Cmt. b.

*Id.* at 307–08. In addition, the Eighth Circuit Court of Appeals in *Geiger* provides similar guidance which is quite compelling, especially in light of the Supreme Court's affirmance of said decision in *Kawaauhau:*

> [T]he word "intentional," by itself, will, almost as a matter of natural reflex, cause a lawyer's mind to turn to that category of wrongs known as intentional torts, a category that excludes injuries caused by acts that are merely negligent, grossly negligent, or even reckless.
>
> \*　\*　\*　\*　\*　\*
>
> We therefore think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on "the consequences of an act rather than the act itself." *Restatement (Second) of Torts* § 8A, comment a, at 15 (1965). Unless the actor "desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it," he or she has not committed an intentional tort. *Id.* § 8A at 15.

*Geiger,* 113 F.3d at 852.

The Court finds such reasoning persuasive. Thus, following the aforementioned reasoning and pursuant to the Supreme Court's holding in *Kawaauhau,* a creditor, in order to prevail under § 523(a)(6), must demonstrate by a preponderance of the evidence, that the debtor desired to cause the injury complained of, or that the debtor believed that the consequences were substantially certain to result from the debtors acts. In other words, in the case of a conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

## IV

Applying the foregoing to the evidence at bar, the Court finds that AVCO has not met its burden of proof under either 11 U.S.C. § 523(a)(2)(B) or § 523(a)(6). First, the Court finds that AVCO's reliance under § 523(a)(2)(B) was not reasonable. Kidd testified that he told Jared that several of the items had been awarded to Jeanne pursuant to a Decree of Dissolution. An ordinary person presented with this information would have recognized at once the obvious falsity of Kidd's financial statements. This case merely exemplifies the principal recognized by courts, including the Supreme Court:

> While the legislative history to section 523(a)(2)(B) mentions that a "creditor often has sources of information, such as credit bureau reports, to verify the accuracy of a debtor's list of debts on a financial statement," a careful reading discloses that this statement is a recognition of creditors' unprincipled practice of using forms or providing instructions that produce an incomplete financial picture of the debtor and then later suing the debtor claiming intentional fraud based on the debtor's signing a declaration regarding the completeness of the statement. *See* H.R .Rep. No. 95–595, at 130–31, U.S.Code Cong. & Admin.News 1978, at 6091–6092.

*Groth v. Masegian (In re Masegian),* 134 B.R. 402, 407 (Bankr.E.D.Cal.1991); *Field,* 516 U.S. at 76–77, 116 S.Ct. at 446–47.

In addition, the Court finds that it was Kidd's good credit and past loan history of almost ten years that convinced AVCO to remove Jeanne's name from the two AVCO obligations. In fact, the entire loan re-write by AVCO was to remove Jeanne's name from the loans, not to loan Kidd additional funds. Furthermore, the value of the collateral, less the items belonging to Jeanne, were still $8,598.99, which exceeded $5,408.89—the amount re-financed.[6] For the foregoing rea-

---

6. Jeanne was awarded collateral with a value of $8,400.00. However, at the time Kidd entered

sons, the Court finds that AVCO has failed to prove, by a preponderance of the evidence, that it reasonably relied on Kidd's Schedule of Insured Personal Property. Thus, AVCO's claim under § 523(a)(2)(B) must fail.

 AVCO's claim under § 523(a)(6) must fail as well since AVCO failed to establish that Kidd gave the remaining collateral, consisting of the satellite dish, the guns, the works of art and the VCR to Nicole and his ex-step sons with the intent to injure AVCO. In the case at bar, there is no suggestion whatsoever that Kidd intended, or even desired, to cause injury to AVCO. Moreover, the Court finds no evidence indicating that Kidd believed that AVCO was substantially certain to suffer harm as a result of his actions. Rather, the evidence at trial revealed that Kidd was experiencing mental problems and was on depression medication when he either gave the items to Nicole or Nicole took them.[7] Thus, while Kidd's actions may have been negligent or reckless, they do not rise to the level of willful and malicious.

### V

After carefully considering the facts of the instant case, the Court finds that AVCO has not sustained its burden of proof. First, a lender that knows of obvious inaccuracies in a financial statement is not permitted to nonetheless proceed with its lending, only to sue the debtor at a later date claiming that a debtor's obligation is non dischargeable because the financial statements are materially false—lenders must accept some responsibility for their sometimes unprincipled practices. In addition, AVCO failed to prove that Kidd's unauthorized disposition of collateral was done deliberately or intentionally to injure AVCO. Thus, AVCO's Complaint must fail. Finally, since the matter of fees, pursuant to 11 U.S.C. § 523(d) is

deemed waived, each party shall bear their own costs of suit.

IT IS THEREFORE ORDERED a separate Judgment shall be entered in favor of Defendant, Robert W. Kidd and against Plaintiff, AVCO Financial Services of Billings; and the Complaint to determine the dischargeability of debt filed by AVCO Financial Services of Billings on October 16, 1997, is dismissed with prejudice.

---

into the new agreement with AVCO, he owned, but was not in possession of the 200 Winchester magnum and the 30.06 Savage Rifle. Thus, the total value of collateral that was in Kidd's possession in the fall of 1996 was $7,998.99.

7. From the testimony at trial, it was unclear whether Kidd actually gave the items to Nicole, whether Nicole took the items, or whether Kidd

merely left the items with Nicole when Kidd and Nicole's relationship deteriorated. With regard to the guns, Kidd testified that his ex-step sons had them, and that he never requested that they be returned. The Court assumes that the same is true with the items in Nicole's possession—that Kidd left them with her, and never requested that she turn them over.