In re Robert E. **FORMAN** and Ellen D. Forman, Debtors.

**TIFFANY PROMOTIONS, INC., Plaintiff,**

v.

Robert E. **FORMAN, Defendant.**

**Bankruptcy No. 893–81715–478. Adv. No. 893–8287–478.**

United States Bankruptcy Court, E.D. New York.

May 2, 1995.

Samuel I. Glass, Hempstead, NY, for plaintiff.

Long, Tuminello, Besso, Seligman & Quinlan, by Harold Seligman, Bay Shore, NY, for defendant.

DOROTHY EISENBERG, Bankruptcy Judge.

Tiffany Promotions (the "Plaintiff") commenced the instant adversary proceeding against Robert E. Forman (the "Debtor" or the "Defendant"), seeking to have its judgment debt in the amount of $100,000 plus interest and attorneys fees in the amount of $15,000 deemed non-dischargeable pursuant to 11 U.S.C. Sec. 523(a)(2)(A) and/or (a)(2)(B) of the Bankruptcy Code. The Plaintiff filed a motion for summary judgment as to the entire cause of action, which was granted in part at a prior hearing. A trial was held thereafter on the only remaining undecided issue of whether the Plaintiff reasonably relied on the Debtor's fraudulent acts in advancing funds in the form of a loan to the Debtor's company. Based on the papers filed, the oral arguments presented by the Plaintiff and the Defendant and the trial held before this Court, the Court finds that Plaintiff reasonably relied on Debtor's representations as to the validity, value and collectability of the account receivables allegedly due to CCI from DSS.

## BACKGROUND

The Debtor was an officer, director and 25% stockholder of the company Creative Care, Inc. ("CCI") during the time period in question. He was Vice President and head of administration for CCI and was directly involved in its operations. CCI was a health care company which provided personal aides for the elderly and infirm in the home. CCI had been in existence since July of 1983, and was licensed by the New York State Department of Health on or about August, 1987. CCI was granted Medicaid provider status and was issued a Medicaid provider identification number on or about September, 1984. As a result, CCI was compensated for its services directly from, and in accordance with the schedule of the Department of Social Services of New York ("DSS"). Its accounts receivable arose almost entirely from the payments due to it from the DSS.

As a requirement for being a Medicaid provider and in furtherance of doing business with DSS, CCI entered into contracts with the Department of Social Services for Nassau County ("DSS/Nassau") and the Department of Social Services for Suffolk County ("DSS/Suffolk"). The contracts with DSS/Nassau and DSS/Suffolk required that CCI use only certified aides to provide health care for its clients in the home. Based on its arrangement with the DSS, CCI was paid in excess of four million ($4,000,000) dollars in fees from the DSS as a Medicaid provider.

In approximately April of 1988, the Debtor became aware that DSS/Suffolk had audited its books and at or about this time had commenced an investigation of CCI's files to determine whether CCI had violated the terms of its contract with DSS. Approximately in July of 1988, the Debtor and CCI were advised in writing and by telephone by DSS Nassau and DSS Suffolk that there was a problem discovered by the audit. After hearing of the audit discrepancy, CCI hired its own CPA to audit its books in order to determine whether there had been any discrepancy or whether it could respond to any allegations by DSS in order to clarify any

discrepancy and continue their financial arrangement. At about the same time, in June or July, 1988, the Debtor and CCI were advised that the Attorney General of New York State was investigating CCI for possible fraud and criminal activity. During the time that the investigation was ongoing, approximately October, 1988, Samuel Glass, Esq. ("Glass") was retained as attorney, by Bruce Bernstein and the Debtor to perform certain services (*i.e.* to represent them in their capacity and in furtherance of their interest as stockholders and directors of CCI. [Defendant's Trial Exhibit 2] ). Glass maintains that he was retained: (1) to help obtain financing for CCI; (2) to perform legal services for Bruce Bernstein (another officer and shareholder of CCI); and (3) for legal services in regard to a lease for CCI in East Norwich, New York. Both the Debtor and Bernstein retained individual counsel in regard to the Attorney General's criminal investigation. Glass is the president of and counsel to the Plaintiff. Although Glass was aware that some type of investigation was ongoing by DSS, he testified that he was under the impression, based upon conversations with the Debtor, that the investigation was merely administrative in nature and that CCI might be obligated to pay approximately $20,000 for ministerial or administrative discrepancies and nothing more.

On or about December 22, 1988, the Plaintiff, through Glass, entered into a Security Agreement with CCI whereby the Plaintiff agreed to loan to CCI up to $100,000, secured by CCI's accounts receivables. As a prerequisite to lending the money, the Plaintiff requested and required a certification from CCI as to the extent and validity of its accounts receivable which were to be the collateral for the loan. The Plaintiff did receive certification that as of December 22, 1988, the account receivable owed to CCI was in the amount of $705,000. The certification was signed by another officer of CCI, but the Debtor had provided the information for that certification and had initialled the certification. The Debtor knew that this certification was being required before the Plaintiff would lend the funds. At or about the same time, Mr. Glass contacted the DSS of New York State to inquire whether CCI was an accredited provider, and whether the corporation had accounts receivable due to it from DSS. DSS responded positively to this inquiry. When the Plaintiff loaned the corporation its $100,000, neither Glass nor the Plaintiff knew of the various counts of grand larceny that were being pursued by the Attorney General's Office against CCI and the Debtor for certain practices during the years from November, 1985 through December 31, 1987. There was no evidence produced that the Debtor or CCI alerted Plaintiff to any possible fraud for prior years, or any possible contamination of these accounts receivable. In addition to the certification dated December 22, 1988, the Plaintiff was provided with a certification of accounts receivable owed to CCI as of February 24, 1989, indicating that the receivables were as had been stated previously.

After the loan was made, on or about January 24, 1989, DSS notified the Debtor that CCI's records were being reviewed by the Attorney General's Office for Medicaid Fraud and Abuse and by the New York State DSS Medicaid Fraud and Abuse (Plaintiff's Exhibit 1 to Motion for Summary Judgment). On February 15, 1989, the Debtor received notification by letter from DSS/Suffolk that its contract to operate as a Medicaid provider in Suffolk County was cancelled and that the DSS would pursue its lawful remedies against CCI (Plaintiff's Trial Exhibit A). The letter further reflects that DSS/Suffolk had conducted a full review of CCI's aide files, that the review reflected that CCI was in substantial breach and non-compliance, and that these findings had been previously shared with the Debtor.

On May 4, 1990, the Debtor was indicted, along with other officers, directors, managers, agents and/or employees of CCI in the Supreme Court of the State of New York, County of Suffolk, and charged with one (1) count of Grand Larceny in the First Degree and twenty-two (22) counts of offering a false instrument for filing in the First Degree.

The Debtor was tried, and convicted of one count of Grand Larceny in the Second Degree and fraud pursuant to N.Y.S. Penal Law, Section 155.40. The conviction was

based on allegations that from November 1, 1985 to December 31, 1987, the Debtor defrauded DSS by misrepresenting personal care services by submitting false billings.

"Larceny" is defined in N.Y.S. Penal Law, Sec. 155.05 as follows:

"A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof." Grand larceny in the second degree involves an intentional taking of property of another, which value exceeds Fifty Thousand ($50,000) Dollars. Hon. Michael Mullet, presiding judge at the trial of the Debtor, ordered restitution in the amount of the outstanding accounts receivable owed by DSS, which amount aggregated $819,728.17. The subject accounts were applied to pay for the restitution ordered. These same accounts receivable were the underlying security for the loan to the Plaintiff. No money was paid to Plaintiff.

Thereafter, the Plaintiff commenced an action against CCI and obtained a judgment in the amount of $100,000, with interest at 24% as of March 22, 1989, plus attorneys fees in the amount of $15,000.

On March 26, 1993, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. On June 22, 1993, the Plaintiff commenced an action against the Debtor pursuant to 11 U.S.C. Sec. 523(a)(2)(A), or in the alternative Sec. 523(a)(2)(B), seeking to have the judgment debt, plus interest and attorneys fees owed to the Plaintiff deemed non-dischargeable. The complaint alleges that the Plaintiff was fraudulently induced by the Debtor to rely on the accounts receivable owed by DSS as collateral for the loan to CCI.

The Plaintiff made a motion for summary judgment against the Debtor based on the theory of collateral estoppel. The Plaintiff relied in part on the Sentence and Commitment Order entered by Hon. Michael Mullet in the State Court action to establish each element of Sec. 523(a)(2)(A) or (a)(2)(B) of the Code. A hearing was held on November 16, 1993, and the matter was adjourned by

the Court to permit the Plaintiff an opportunity to provide the Court with additional documentary evidence regarding (i) the findings made by Judge Mullet and (ii) the identity of the accounts receivable collateralizing the loan made by the Plaintiff. The Plaintiff provided the Court with a copy of the State Court's decision regarding the other defendants' motion to set aside the verdict and several other documents.

At the hearing on January 20, 1994, the Court found that the evidence in support of the Plaintiff's motion for summary judgment was insufficient, and denied the motion. On June 27, 1994, the Plaintiff renewed its motion for summary judgment, and provided the Court with a copy of the sentencing transcript from the State Court. At the hearing held on September 22, 1994, the Court determined that the Plaintiff had satisfied each element of Sec. 523(a)(2)(A) and/or (B), except for the issue of reasonable reliance by Plaintiff on the fraudulent written statements regarding the financial condition of CCI, and the value of its collateral. An order was entered granting the Plaintiff's motion for summary judgment except as to the issue of reasonable reliance by the Plaintiff. Those issues have been determined in a prior order from which no appeal was taken. The issue of whether the Debtor intended to defraud the Plaintiff is not now relevant. Whatever may have been presented at trial, the only issue presently before the Court is whether Plaintiff reasonably relied on Debtor's statements and representations as to the soundness and collectability of the receivables when Plaintiff made its loan to CCI.

### DISCUSSION

Section 523(a)(2)(B) of the Code provides as follows:

A discharge . . . does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false:

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

Based on the Court's prior findings, each element of the above cause of action had been established by a preponderance of evidence, except for subsection (iii), reasonable reliance. A trial was held on December 6, 1994 as to the sole issue of whether the Plaintiff reasonably relied on the Debtor's false representations in determining to loan CCI the funds. At the hearing, testimony was taken on a broad range of issues, much of which was outside the scope of the hearing and involved matters previously decided by this Court. Testimony was provided by Glass that his role as counsel to CCI was limited to several corporate matters, including obtaining financing for CCI and negotiating a lease for property in East Norwich, NY. The retainer agreement between Glass and the Debtor and Bruce Bernstein (the President of CCI) reflects that Glass was retained by the Debtor and Bernstein to "represent CLIENTS (Debtor and Bernstein) in their capacity and in furtherance of their interest as stockholders and directors of [CCI]." (Defendant's Trial Exhibit 2). The Retainer Agreement made no reference to defending CCI in connection with any investigation conducted by DSS or the Attorney General's Office. An invoice submitted by Glass to CCI which covered services rendered from October 11, 1988 to November 11, 1988 makes no reference to the investigation by DSS or the Attorney General specifically, and appears to focus on general corporate matters and issues between the shareholders. (Defendant's Trial Exhibit 3). Although the Debtor claims that Glass had knowledge of the Attorney General's investigation on behalf of DSS and possible criminal charges, Glass denies this. It is impossible to glean from the documents introduced that Glass had knowledge that the accounts receivable were of questionable value as having been procured by fraud committed several years earlier.

Glass testified that the Debtor made false representations to the Plaintiff regarding the worth of the accounts receivable owed by the DSS, given the fact that the Debtor was aware of the serious nature of the ongoing investigation. The Debtor did testify that he believed he was not guilty of any crime, but the Debtor's understanding was not at issue. Rather, the issue was whether Glass reasonably relied on statements regarding the worth and collectability of the collateral.

■ Courts have adopted an objective standard in determining whether reliance is reasonable, focusing on the degree of care exercised by the plaintiff, given the circumstances of the business transaction. *In re Reisman*, 149 B.R. 31, 38 (Bankr.S.D.N.Y. 1993), citing *In re Galizia*, 108 B.R. 63, 68 (Bankr.W.D.Pa.1989). In addition, the plaintiff must have actually relied on the representations. *In re Wiener*, 144 B.R. 17, 21 (Bankr.E.D.N.Y.1992), citing *In re Tesmetges*, 74 B.R. 911, 916 (Bankr.E.D.N.Y.1987), *aff'd, In re Tesmetges*, 86 B.R. 21 (Bankr. E.D.N.Y.1988).

■ From the credible testimony of Glass, and all the evidence presented at trial, this Court finds that the Plaintiff reasonably relied on the certification of CCI's accounts receivable prepared for Plaintiff's benefit by the Debtor, and the representations made by the Debtor on behalf of CCI. Such reliance was objectively reasonable, given the circumstances surrounding the transaction. No evidence has been provided that the Plaintiff knew prior to making its loan that the accounts receivable were of questionable value. Knowledge of an administrative investigation is not the equivalent of knowledge that the accounts receivable were tainted and subject to forfeiture as a result of a fraud upon the State's DSS agency. Plaintiff had no way of knowing that the accounts receivable were potentially worthless collateral for its loan.

Although the certifications were not signed by the Debtor, one of the certifications was initialled by the Debtor. In addition, the Plaintiff testified that the Debtor was its administrative officer and a shareholder "caused" the certifications to be prepared for CCI. The Debtor also initialled the Security Agreement memorializing the transaction,

which contained references to the accounts receivable as collateral. The Debtor was sufficiently closely intertwined with CCI and the officer in charge of the information contained therein to have caused the certifications to be issued, and will be charged with their issuance.

Based on the evidence provided, this Court finds that the Plaintiff reasonably relied on the certifications and the purported worth of the accounts receivable as represented by Debtor in deciding to loan the funds, and that the Plaintiff's motion for summary judgment is granted as to Sec. 523(a)(2)(B) of the Code.

Finally, the issue of whether the attorneys fees awarded in the prior judgment if that judgment is found to be non-dischargeable are also non-dischargeable has not been directly addressed by either party. The Court notes that although there is no Second Circuit authority on this issue, there is ample case law in support of finding that the fees awarded in the prior judgment are non-dischargeable as well. *See In re Weinstein,* 173 B.R. 258, 275 (Bankr.E.D.N.Y. 1994), citing *Jordan v. Southeast Nat'l Bank (In re Jordan),* 927 F.2d 221, 227 (5th Cir. 1991). Other citations omitted. The award for counsel fees was based on the contractual debt and the Security Agreement, which contemplated an award of attorneys fees in the event of default. To discharge the ancillary obligation of counsel fees would impede one of the purposes of the Code, which is to discharge only honest debtors from their debts. *Id.* Therefore, the entire judgment debt shall be deemed non-dischargeable, including the fee award in the amount of $15,000.

### CONCLUSION

1. The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. Sec. 1334 and 157(a).

2. This is a core matter under 28 U.S.C. Sec. 157(b)(2)(I).

3. The Plaintiff reasonably relied upon the certifications by CCI and on Debtor's representations as to the value of the receivables due from DSS and was injured thereby.

3. The judgment debt owed by the debtor to the Plaintiff in the amount of $115,000 plus statutory interest from the date of the judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) of the Code.

Settle an Order in accordance with this decision.