**In re Frank A. and Jerilynn VALLEY, Debtors.**

**FIRST SAFETY FUND NATIONAL BANK, Plaintiff,**

**v.**

**Frank A. and Jerilynn VALLEY, Defendants.**

**Bankruptcy No. 4–81–00215–G. Adv. No. 4–81–0124.**

United States Bankruptcy Court, D. Massachusetts.

July 16, 1982.

---

**16.** *See* Pa.Stat.Ann. tit. 41, § 202 (Purdon Com. Supp.1981).

Howard J. Potash, Worcester, Mass., for plaintiff.

Philip Salny, Salny & Salny, Fitchburg, Mass., for defendants.

## MEMORANDUM AND ORDER ON COMPLAINT OBJECTING TO DISCHARGE AND FOR NONDISCHARGEABILITY OF DEBT

PAUL W. GLENNON, Bankruptcy Judge.

First Safety Fund National Bank ("Bank") seeks an order denying the debt-ors a discharge and/or an order declaring its debt nondischargeable. The debt arose from a $24,000 loan by the Bank to the debtors or, as the Bank avers, to a partnership between Mr. Valley and one Steven Ladd.

The Bank alleges generally that there were material misrepresentations in the financial statement of Frank Valley concerning his income and the value of his home, and that in reliance upon that statement, the Bank was induced to make the loan to its subsequent detriment. Additionally, the Bank alleges a material misrepresentation by Steven Ladd concerning certain collateral he pledged as security for the loan, and for which the debtors should be liable under general partnership principles. The debtors have denied the existence of any partnership. There are also allegations by the Bank of fraudulent concealment of collateral by the debtors after the loan went into default and averments concerning false statements in the debtors' bankruptcy schedules. For the reasons which appear below, I find the debt of the debtors to the Bank to be dischargeable and would, therefore, deny all the relief requested by the Bank.

### FACTS

Frank and Jerilynn Valley live in Hubbardston, Massachusetts in a dwelling which can best be described as dilapidated.[1] For the last ten years Mr. Valley has been a self-employed "logger" which, by the Court's understanding and Mr. Valley's testimony, means that he hires himself out as an independent contractor to cut or "harvest" timber, and is paid according to the quantity of lumber he delivers to a mill. There is no indication that Mr. Valley has been an employee or wage earner of any person or corporation during the recent past, but instead, that he works indepen-

---

1. On this point, the Court heard testimony from three appraisers and personally took a view of the property. While all are in agreement concerning the poor condition of the house, there is wide disparity concerning its value. The Court's conclusion will be discussed further on in this memorandum.

dently and on a contract basis. In that regard, Mr. Valley became acquainted with and from time to time worked for one Steven Ladd, who hired him on a number of occasions to harvest timber.

On April 3, 1979, Frank Valley and Steven Ladd went to the Bank to apply for a loan in order to purchase a 1970 Kenworth tractor. Mr. Valley testified that he told the loan officer that the loan was a personal one, but that if he was successful in buying the truck, that he and Ladd intended to form a partnership. No explanation was given as to why a "logger" and one for whom he worked from time to time would be in need of such a vehicle. Presumably business was off, and the two men were looking for a means to supplement their income, but it was never shown by whom or for what purpose the truck was to be used.

Mr. Valley stated that sometime after meeting with the Bank's loan officer, the loan officer suggested that the loan documents be drafted to reflect a partnership loan, thereby avoiding the necessity of having new documents drafted when the partnership was formed.[2]

In his personal financial statement to the Bank on April 3, 1979, Frank Valley listed assets of $27,800, including a home worth $20,000.[3] His stated liabilities were only $1335, leaving a net worth of $26,465. Additionally, the financial statement asks for "income received during the year ending 19___". The year was not filled in, but I think it is fair to assume that both sides were talking about 1978. In any event, Mr. Valley listed income of $36,900.[4] There was no testimony or evidence to indicate that any other personal financial statement was relied upon by the Bank in making the loan.[5]

On April 18, 1979, the Bank loaned $24,000 to L&V Trucking and took back a business installment note for a total amount, including interest, of $29,950.92 signed by Ladd and Valley for L&V Trucking, and co-signed by Mrs. Valley. Additionally, the 1970 Kenworth truck-tractor was pledged as security along with a 1970 Franklin log skidder which was owned by Ladd. In connection with the log skidder, the Bank alleges, and it is uncontroverted, that Steven Ladd represented that the skidder was "free and clear," or otherwise unencumbered. In fact, it was encumbered by a prior lien in favor of Commercial Credit Equipment Corporation ("CCEC"). When the skidder was eventually repossessed and sold, CCEC and the Bank agreed that CCEC would receive $4500, and the Bank would receive all excess proceeds. It is the Bank's contention that Ladd's misrepresentation is attributable to Valley because they were partners.

Mr. Valley had difficulty making payments to the Bank from the start. Mr. Valley testified that he realized very early on that the truck was not paying for itself, and at some point in time several months after the loan was made,[6] Mr. Valley notified the Bank of his intention to sell the truck due to his inability to meet the bank payments.[7] However, his efforts to sell it proved futile, and collection by the Bank became necessary.

Mr. McNamara testified that when the Bank attempted to repossess both the truck

---

**2.** Mr. Valley testified that, in fact, the partnership "never really materialized."

**3.** The application indicates a house and two barns on a three acre parcel acquired in 1970 at a cost of $4500, but a "market value" in 1979 of $20,000. In fact, there are only two acres, one barn and a garage.

**4.** Mr. Valley testified that the figure of $36,900 was his "gross income and that, after deducting the expenses of his trade, his "net" income was closer to $9,000. The statement does not indicate whether "gross" or "net" income is to be reported, and makes no provision for the deduction of expenses.

**5.** It isn't clear from the testimony whether Mr. Ladd ever filled out such an application, but in any event, no financial statement of Ladd's was introduced.

**6.** The Bank's records show that Mr. Valley contacted them on September 20, 1979.

**7.** The same bank records, however, indicate that as of 9/20/79, the loan balance was being "paid as agreed".

and the skidder, both Valley and Ladd claimed ignorance as to the whereabouts of either piece of equipment. Mr. Valley explained this by saying that he never had possession or control of the skidder because it belonged to Ladd. Further, he testified that Ladd had taken the truck in June of 1979 for a cross-country trip, and that he never saw Ladd or the truck again until March 2, 1980.

After finally liquidating its collateral, the Bank sought and, on March 2, 1980, obtained a judgment against all three persons concerned for a deficiency of $13,792.15 plus interest of $1,069.65, or a total of $14,861.80.[8] On March 26, 1980, the Bank was granted an attachment on the debtors' home in the amount of $10,000. According to Mr. McNamara, the truck was sold after Mr. Ladd notified the Bank that it could be picked up in Concord, New Hampshire. The skidder was sold after CCEC contacted the Bank and notified it of its prior lien and of the whereabouts of the skidder. There is absolutely no testimony or evidence to suggest that Mr. or Mrs. Valley in any way concealed the Bank's security or otherwise impaired the Bank's attempts to repossess its security. The only testimony in the case, and I so find, was that the Valleys had no idea as to the whereabouts of either piece of equipment after June 1979, nor any control over the equipment after that time.

The debtors filed their joint petition in bankruptcy under Chapter 7 on March 24, 1981. The schedules filed with their petition show outstanding priority tax liabilities of $1150.36, and unsecured debts to Asnacomet Federal Credit Union ($406.19), First Safety Fund National Bank ($1436.80 on a separate personal loan), Sears Roebuck & Co. ($432.21), and the judgment debt to the Bank. The Bank argues that the petition was filed to hinder its collection efforts and that, because of the nominal amounts of unsecured debt other than the Bank's, the debtors' petition was not filed in good faith.

Additionally, the schedules list the property of the debtors as a single family home valued at $5000, and various household and personal property valued at $3050, almost all of which is claimed as exempt. The Bank contends that the schedules misstate the value of the debtors' home, and that its true value is $22,250. The debtors' experts both testified that the land has a value of $5,000, and that the house thereon has no value at all due to its condition. The Town of Hubbardston had assessed the property, at 100% valuation, as having a fair market value of $3,120 in 1981. I find, based upon all the evidence and in light of having personally seen the property, that $5000 is not an unreasonable valuation for the debtors' real property. Moreover, in view of the poor structural condition of the house, and the serious defects contained therein, keeping in mind that the house is eighty years old and has no central heat, that the Bank's alleged value of $22,500 is clearly unreasonable. Perhaps most indicative of the home's state of disrepair was Mr. Valley's testimony that he is unable to obtain insurance on his home due to its condition.

Finally, in the Statement of Financial Affairs filed with their petition, Mr. & Mrs. Valley state that their combined incomes for 1979 and 1980 were $9,000 and $11,000 respectively. The Bank alleges that this information is probative of the fraud by Mr. Valley in claiming on the Bank's financial statement that his income for 1978 was almost $37,000, when in fact he knew it was only $9,000. Valley testified that he was asked what his "salary" was, and he took that to mean how much money did he make, not his net profits.

## DISCUSSION

First, let me note that the Bank's arguments regarding the number and size of the debtors' creditors are inapposite, for the right to a discharge is not dependent upon

---

8. The judgment notes an award of $3,791.16 as attorney's fees, which the debtors (sic) say should be added on to the judgment. However, counsel for the Bank stated at trial that the judgment included the award of attorney's fees.

That explanation seems reasonable since the Bank's judgment lien was for $10,000, which equals the $13,792.15 award, less $3,791.16 for attorney's fees.

such factors. Further, it has been held that even where the debtor has no unsecured creditors, and only one judicial lien creditor whose lien was partially avoidable under § 522(f), a Chapter 13 plan may be confirmed. See *In re Cohen*, 13 B.R. 837, 7 B.C.D. 1399 (Bkrtcy.E.D.N.Y.1981). Lastly, although the Court's finding as to the value of the debtors' real estate moots any discussion that the debtors are solvent, I know of no case law which *requires* the dismissal of a case or the denial of a discharge simply because the debtors erroneously believed they were insolvent. Here, however, the debtors' liabilities clearly exceed their assets and their ability to pay their debts as they become due.

■ On the question of a general denial of a discharge, the Bank's arguments also fail. The Court has found that the value of the debtors' real estate as it was listed in their schedules was accurate and, therefore, I conclude that there has been no knowing and fraudulent false oath in connection with the debtors' bankruptcy case that would merit denial of a discharge under § 727(a)(4).[9] Further, since the Court has also found that the Bank has failed to carry its burden of proof[10] with respect to fraudulent concealment of property, denial of discharge also is not warranted under § 727(a)(2). The Bank's evidence was not specific enough on this count to merit the punitive act of denying the debtor a discharge. Indeed, the debtor's testimony in rebuttal showed a plausible explanation for why the truck was not available to be returned to the Bank.

Therefore, I turn now to the meat of the Bank's complaint, namely whether an exception to discharge should be granted for fraud and/or misrepresentation in the inducement of the loan. Section 523(a)(2) sets forth two distinct grounds for excepting a debt from discharge:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders' financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused or made to be published with intent to deceive.

Sub-sections (A) & (B) set forth two alternative types of false or fraudulent representations. The latter section is commonly known as the "false financial statement" exception to discharge, while the former covers all other types of false representations or fraud. In this case, sub-section (B) is clearly the applicable statutory reference to the Bank's allegations concerning Mr. Valley's personal financial statement submitted in connection with the loan. However, the Bank has presented additional charges concerning a false statement by Mr. Valley's alleged partner, Ladd. Since no written financial statement of Ladd's was ever submitted in evidence,

---

9. Section 727 provides, in part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) The debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

\* \* \* \* \* \*

(4) The debtor knowingly and fraudulently, in or in connection with the case—
(A) made a false oath or account;

10. The Bank's evidence indicates only that it had difficulty locating its collateral. Whether that difficulty was attributable to Valley was never established. Finally, even if Ladd was the one secreting the collateral, the Bank did not show when he became aware of the Bank's intention to repossess, or that he subsequently hindered that effort.

§ 523(a)(2)(A) must be consulted in connection with those allegations concerning Ladd.

■ Looking first at § 523(a)(2)(A), the courts have generally applied a five part test for determining the dischargeability of a debt incurred by fraud or false representations. See *In re Houtman*, 568 F.2d 651 (9th Cir. 1978) (decided under § 17(a)(2) of the old Act); *In re Brewood*, 15 B.R. 211, 8 B.C.D. 483 (Bkrtcy.D.Kansas 1981). The requirements are: (1) a false representation by the debtor; (2) known to be false at the time it was made; (3) made with the intention and purpose of deceiving the creditor; (4) which was reasonably relied upon by the creditor; (5) which resulted in loss or damage to the creditor as a result of the false representation. *In re Houtman*, supra at 655; *In re Kojoyian*, 7 B.R. 719 (Bkrtcy.D. Mass.1980).

■ In the case at bar, the Bank seeks to attribute to the debtor the admittedly false representation made by Ladd concerning the lack of encumberances against property pledged as collateral for the loan. The Bank argues that Valley is estopped to deny the existence of a partnership between Ladd and himself and that, concomitantly, he is responsible by the principles of agency for the false representations of his partner. However, whether a partnership existed or not, or whether Valley is estopped to deny its existence, the bank has simply failed to establish all of the elements necessary for a finding of nondischargeability. There was no evidence at all that Ladd's statement was knowingly false. The officer for CCEC testified that he agreed to release his lien on Ladd's skidder because there was other collateral available to satisfy CCEC's debt from Ladd. From this set of facts, it is possible that CCEC's lien arose as the result of an "after-acquired property" clause in a previous security agreement or as the result of a "blanket mortgage" agreement, which Ladd, being an unsophisticated businessman, may not have fully understood. In other words, the fact that the false statement was made does not itself establish that it was knowingly made.

■ Further, although intent to deceive may be inferred from the circumstances of a case or after a prima facie showing of fraud, *Carini v. Matera*, 592 F.2d 378 (7th Cir. 1979); *In re Schlickmann*, 6 B.R. 281 (Bkrtcy.D.Mass.1980); *In re Drewett*, 13 B.R. 877 (Bkrtcy.E.D.Pa.1981), sufficient circumstances or facts must be established to permit the Court, as finder of fact, to reasonably conclude that the representation was known, or should have been known, to have been false. Here, the Bank has established the existence of a false statement, upon which it relied in making a loan, which loan subsequently was found not to have been adequately collateralized. There has been no testimony or evidence surrounding the circumstances of the false representation made by Ladd. Indeed, while the debtor may have called Ladd as a witness to rebut any inferences, the Bank certainly has the burden of establishing a prima facie case of fraud. Whether Ladd knew or should have known of the falsity of his statement certainly is material to a finding of both his intent to deceive and of his actual fraud. Where Ladd's fraud has not been established, the same cannot be attributed to Valley under any theory.

The last remaining issue then concerns the exception to discharge under § 523(a)(2)(B), which places at issue Valley's financial statement to the Bank. The statute requires a materially false statement in writing respecting the debtor's financial condition, made with intent to deceive, and which was reasonably relied upon to advance money, property, credit or services. 11 U.S.C. § 523(a)(2)(B). I conclude that the Bank has failed to carry its burden with respect to a showing of the debtor's intent to deceive.

Some of the decisions of other courts have attempted to set forth a meaningful definition of the term "materially false", as it is used in § 523(a)(2)(B). In the case of *In re Tomeo*, 1 B.R. 673 (Bkrtcy.E.D.Pa. 1979), it was held that the term "materially false" meant a "substantial and important untruth". There it was decided that the debtor's false representation concerning the value of household furniture was substan-

tial enough to merit a finding of "material" falsity. In the case of *In re Drewett*, supra at 879, it was held that a materially false statement was one that was no more than "actually false", or simply "false" or "untrue." However, I don't feel either definition goes far enough in explaining the factual proof necessary for a finding of material falsity under § 523(a)(2)(B). For it is the total financial statement which is of concern in § 523(a)(2)(B). The requirement that the financial statement be false necessitates an examination of the actual truth of its components (*Drewett*). However, the statute requires the Court to determine whether the financial statement as a whole can be said to be a false representation of the over-all financial condition of the debtor. What is material for some purposes is not so as to others. For instance, the debtor here misstated the value of his home by $15,000 ($20,000 instead of $5,000), which represents a 400% inflation of value. Certainly such a falsity is a "substantial and important" untruth (*Tomeo*) if we are only concerned with the value of the debtor's home. But, the statute speaks of a materially false *financial statement*, inclusive of all of its parts. If the debtor here were shown to have had a net worth of $500,000, it is entirely conceivable that under many circumstances his financial statement could be found fair and reasonable, even with the error regarding his home. It is the debtor's actual financial condition and the picture he paints of it that is at issue, and the materiality question should be judged in that light, and not on the basis of the seriousness or size of his individual error. Perhaps all courts have understood the statute to mean what I have just said, but no court has seemed to have clearly articulated it.

■ In any event, I find that the debtor's representation in his financial statement to the Bank concerning the unencumbered value of his home was, in fact, false, and was such as to render the financial statement, as a whole, materially untrue. The error increased the debtor's net worth from $11,465 to $26,465, which is significant in light of the debtor's financial status. I attach no significance to the Bank's allegations concerning the debtor's statement of income. The question posed on the financial statement was capable of more than one interpretation and Mr. Valley was not such an experienced businessman that the Court could find that he should have known what was meant by the term income. If the representation of income was false, it was due to the Bank's poor language in the Bank's form. On the other hand, the Court has affirmatively found that the value of the debtor's home was misrepresented in fact, and that the financial statement was rendered materially false thereby. Moreover, I conclude that the Bank did reasonably rely on the debtor's financial statement. I am troubled that the Bank made no inquiry into how the debtor's home had appreciated so much in value in such a short time, but on balance, and because the value of the home probably was not critical to its decision to lend, because of the other collateral which was pledged, I find the Bank acted reasonably in relying on the statement.

■ However, I find that the Bank has failed to show a knowing and intentional deception by the debtor in his financial statement. The burden of proof for a creditor seeking exception of a debt from discharge is that of "clear and convincing" evidence. *In re Tomeo*, supra at 677; *In re Drewett*, supra at 879. Furthermore, it has been held that intent to deceive may be inferred from a knowingly made false statement, *In re Brewood*, 15 B.R. 211, 8 B.C.D. 483 (Bkrtcy.D.Kansas 1981) or, in other words, intent usually requires a finding that the debtor knew or should have known of the falsity of his statement.

Here the Court has determined three years after the fact that the property was most likely worth only $5000 at the time of the loan, and not $20,000, as was stated by the debtor. Yet the Bank's own expert witness, for purposes of a different count in the complaint, testified that the home had a value of approximately $22,000 in May, 1981. I have often said both in written decisions, and in open court, that there is no

more elusive and illusory term in the English language than "value". Even courts cannot agree on a definition for each and every situation. Therefore, I have always attempted to use reason when disputes over value arise.

Here the debtor testified that $20,000 was what he felt his home was worth to him, or stated differently, $20,000 was his likely replacement cost. A home, albeit a dilapidated one, is nevertheless a home. And where reasonable men may differ as to the value of the debtor's home, in particular, experts who are knowledgeable in such matters, it is not unreasonable to conclude that the debtor's representation of value, while subsequently held to be erroneous, was not so far-fetched as to attribute knowing or intentional deceit to his conduct. While I cannot say for a fact that the debtor was being totally forthright in his valuation, in view of the substantial burden of proof, I cannot conclude that the Bank has established clearly and convincingly an intent by the debtor to deceive it. Accordingly, I would deny all the relief requested by the Bank.

Finally, since it is apparent that the debt was not a consumer debt [a purchase-money loan for a truck-tractor—See 11 U.S.C. § 101(7)], the award of costs and reasonable attorney's fees is not warranted under § 523(d). Further, I find that the Bank's complaint had substantial merit, but that it simply failed to properly carry its burden of proof. Therefore, even if § 523(d) were applicable, I would find that such an award would be clearly inequitable. Accordingly, the debtor's request for the same is denied.

Judgment is entered for the defendants in accordance with the foregoing Memorandum. SO ORDERED.