In re Margaret **LAUNZEL–PENNES, Debtor.**

**EUROPEAN AMERICAN BANK, Plaintiff,**

v.

Margaret **LAUNZEL–PENNES, Defendant.**

Bankruptcy No. 894–80505–478. Adv. No. 894–8151–478.

United States Bankruptcy Court, E.D. New York.

Jan. 12, 1996.

Corwin Solomon & Tanenbaum, P.C. by Mitchell D. Goldberg, New York City, for Plaintiff.

Speno Goldberg Steingart & Penn, P.C. by Joseph E. Macy, Mineola, New York, for Defendant.

## DECISION DECLARING DEBT NON–DISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(2)(B)

DOROTHY EISENBERG, Bankruptcy Judge.

Before the Court is an adversary proceeding in which the Plaintiff, European American Bank ("EAB") seeks a determination that a debt of $319,479.03 including interest arising from the personal guaranty of a corporate line of credit by Margaret Launzel–Pennes, (the "Debtor") be deemed non-dischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code, 11 U.S.C. A trial of this matter was held by this Court on October 16, 1995. After reviewing the pleadings, evidence, post-trial memoranda and case law, this Court concludes that EAB has sustained its burden of proof. Accordingly, for the reasons set forth below, the subject debt owed by the Debtor to EAB is declared non-dischargeable.

## BACKGROUND

The Debtor is an officer and stockholder of an entity known as International Expositions Management Group ("IEMG"), a New York corporation. IEMG was established in early 1992. The Debtor is one of three principals

of IEMG, the others being Edward Launzel, the Debtor's father and IEMG president, and William McKanna, the executive vice-president. All three principals held a one-third ownership interest in IEMG. IEMG was in the business of conducting and managing trade shows, primarily in the footwear industry. At the time it was a newly formed corporation, with no prior business history except for the fact that the Debtor's father had been involved in a similar business running shoe trade shows successfully.

During 1992, representatives of IEMG made application to EAB for a line of credit in the sum of $300,000. In connection with the credit application process EAB conducted its "due diligence," including meeting with IEMG representatives and reviewing IEMG's books, records and financial condition, made an on-site inspection of IEMG, and reviewed its limited assets which consisted primarily of some minimal accounts receivables. Representatives of EAB met with IEMG representatives on four or five separate occasions to investigate the feasibility of extending credit to IEMG. Because IEMG was a new business enterprise without any reliable financial history, and very limited assets to provide collateral to the bank, EAB required the Debtor and the other principals of IEMG to execute written personal guarantees of IEMG's obligations to EAB. According to Gerard Baccaglini, an EAB vice president with personal knowledge who testified at trial, EAB does not have a standard practice as to when it requires a personal guaranty, but they are typically required when making loans to newly formed companies. As part of the credit application, the Debtor delivered to EAB two personal financial statements. The Debtor testified that she never consulted any documents, such as the contract of sale on her home, to obtain exact figures when completing the financial statements. The first statement prepared by the Debtor was dated June 24, 1992 (the "June statement") (EAB's Ex. A). At the behest of EAB, the Debtor resubmitted the June financial statement, dated July 28, 1992 (the "July statement") (EAB's Ex. B), on a standard form provided by EAB which contained the following attestation clause on the lower portion of the first page:

To: EAB

The information contained in this statement is provided for the purpose of obtaining or maintaining credit with you on behalf of the undersigned, or persons, firms or corporations on whose behalf the undersigned may either severally or jointly with others, execute a guaranty in your favor. **The undersigned understands that you are relying on the information provided herein (including the designation made as to ownership of property) in deciding to grant or continue credit. The undersigned represents and warrants that the information provided is true and complete and that you may consider this statement true and correct until written notice of a change is given to you by the undersigned.** This statement shall remain your property, whether or not credit is extended. You are authorized to make all inquiries you deem necessary to verify the accuracy of the statements made herein, and to determine the undersigned's credit worthiness including, but not limited to procuring consumer reports from consumer reporting agencies and credit information from banks and other financial institutions and extenders of credit, present and former employers, merchants, landlords and creditors. Upon request, EAB will inform the undersigned if a consumer report was requested and will give the undersigned the name and address of the consumer reporting agency. The undersigned hereby authorizes you to answer questions and provide information about your credit experience with the undersigned. Anyone receiving a copy or reproduction of the signatures below is authorized to provide the foregoing information.

(EAB's Ex. B) (emphasis added). Apparently, this clause was the only significant difference between the Debtor's June statement and the July statement.

On October 21, 1992 EAB entered into a banking relationship with IEMG under which EAB established a line of credit in favor of IEMG in the amount of $300,000. The bank received a security interest in the corporation's accounts receivables and the guaranty given by the Debtor in favor of EAB served,

along with the personal guarantees of IEMG's other principals, as security for the line of credit. The money was advanced to IEMG in November, 1992. The total principal amount borrowed was due on May 31, 1993 and interest [1] was payable on a monthly basis.

The Debtor's personal financial statement reflects a value of $385,000 for the Debtor's interest as sole owner of her real property, her home, with a total net worth of $146,000 of which the equity in the real property represented $136,000. There was no apparent reason for EAB to doubt or distrust this statement. EAB did not request, nor did it obtain an appraisal of this property in 1992. The bank did request a TRW report, but this does not reflect any market value for real property. The Debtor's equity in her real property together with the equity in her father's real property, reflected that the bank had guarantees worth approximately $270,000, slightly less than the debt.

By mid-May, 1993, a mere six or seven months after the credit was extended, IEMG had exhausted the entire $300,000 line of credit and defaulted on the payment of principal. Evidence adduced at trial showed that the money was spent for overhead expenses, the printing of ads and brochures, the preparation for an exhibition in Las Vegas which never occurred and salaries of $6,600 per month for, as the Debtor described, each "principal's family unit." IEMG ceased operations in May or June of 1993 after conducting only three shows, the last of which occurred in August, 1992. None of these shows took place after the credit was extended by EAB. The Debtor filed a voluntary petition for relief under Chapter 7 of the Code on January 28, 1994. Her petition was dated December 2, 1993. Schedule F accompanying the Debtor's petition listed an unse-

cured non-priority claim of $300,000 owed to EAB with the Debtor listed as a co-debtor, and indicated that claim to be in dispute. However, there is no evidence provided to dispute the amount owed. The only dispute arises as to whether this debt is to be deemed non-dischargeable. The petition reflects a net worth of negative $313,000, or negative $13,000, without the $300,000 debt.

EAB commenced this adversary proceeding on March 29, 1994 alleging various material misrepresentations, omissions and false statements made by the Debtor in her July, 1992 personal statement upon which EAB relied.

At the trial of this matter, EAB produced two witnesses—Gerard Baccaglini, corporate loan vice president for EAB and Howard R. Brower, a duly qualified real estate appraiser with the firm of Ray Brower Associates, who, at EAB's request, performed an appraisal of the Debtor's residence located at 34 Smith Street in Glen Head, New York (the "Glen Head property"). The Debtor testified as the sole witness in her defense. EAB sought to establish four primary issues as material misrepresentations or omissions by the Debtor in her July, 1992 personal financial statement submitted to EAB.[2]

*First,* on Schedule A of her petition, the Debtor set forth that her home was jointly owned by herself and her husband, David Pennes (EAB's Ex. C). However, each of the two financial statements provided by the Debtor in connection with the line of credit application listed the Debtor as the sole owner of her home. At trial, the Debtor testified that she had mistakenly listed the property as jointly owned in her bankruptcy petition, and that at all times since 1988 her residence was owned exclusively by herself. A certified copy of the Bargain and Sale deed (Debtor's Ex. 1) to the premises admitted

---

1. Interest was payable monthly at the rate of 1% above the prime rate of interest charged by EAB from time to time and which interest rate increased to 4% above the prime rate of interest charged by EAB upon any amount of the principal not being paid when due.

    The claim includes interest totaling $19,479.03 from June 3, 1993, when IEMG defaulted, through the date of the filing of the petition.

2. The Court points out here that although EAB alleged in paragraphs 11 and 12 of its complaint that the Debtor's financial statements were materially false because they omitted claims for taxes owed and liabilities for parking violations from 1987 through 1989, EAB offered no proof as to these matters and has not made out a *prima facie* case as to these two allegations. Thus, these allegations do not rise to the level required to find the debt non-dischargeable.

into evidence at trial plainly shows that the subject property was conveyed from David Pennes and Margaret Launzel–Pennes, husband and wife, to Margaret Launzel–Pennes on May 2, 1988. The deed bears the signature of both of those parties and is duly notarized. Also, the instant deed was recorded on June 9, 1988 and was accompanied by a certification of the County Clerk. This Court finds that the property was at the time of the July, 1992 statement and presently is, solely owned by the Debtor. Therefore, as far as EAB is concerned, there was no material false statement made by the Debtor.

*Second,* EAB sought to establish that the Debtor neglected to indicate an ownership interest in a corporation known as Think Services, Inc. ("TSI"). The Debtor testified, during cross-examination, that she was a 50% shareholder of this entity (her husband owned the other 50%) which she described as the sales and marketing arm of IEMG. TSI performed work for IEMG in a way similar to a sub-contract arrangement. The Debtor further testified that she was an employee of TSI during early 1992 before IEMG was started and that subsequently, TSI was paid $6,600 per month by IEMG and the Debtor was, in turn, paid by TSI. The Debtor's uncontroverted ownership interest in TSI was never reflected on either her personal financial statements or the bankruptcy petition, nor did the Debtor introduce any evidence to show otherwise.

This Debtor omitted from her personal financial statements any indication of her ownership interest in TSI. Although this allegation was not raised in EAB's complaint, it was, nevertheless, proved at trial. Under Rule 15(b) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7015 of the Federal Rules of Bankruptcy Procedure, "when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The Debtor did not object at trial to the introduction of evidence about this issue as not being within the issues made by the pleadings and so, the Court will address this issue. Only EAB discussed this issue in its post-trial papers.

The law is clear that writings containing pertinent omissions may qualify as "materially false" for purposes of a section 523(a)(2)(B) violation. *In re Erdheim,* 180 B.R. 42, 46 (Bankr.E.D.N.Y.1995) (citation omitted). As presented above, the Debtor's uncontroverted ownership interest in TSI was never indicated on either her personal financial statements or the bankruptcy petition, nor did the Debtor introduce any evidence to show otherwise. On the July financial statement the Debtor did check "Yes" in response to the query "Are you a partner or officer in any other venture?" but she neglected to follow the further direction below that question which instructed "If yes for either applicant or co-applicant, give details." Hence, EAB had no way of knowing about the Debtor's equity interest in TSI, or whether it had any value. Therefore, they could not have reasonably relied upon her interest in this entity.

*Third,* EAB attempted to prove that the Debtor made materially false representations as to the number of mortgages encumbering the Glen Head property. On both the June and July personal financial statements, the Debtor represented that there was an existing 30 year real property mortgage in the sum of $240,000 upon the Glen Head property. EAB attempted to show that there were two other mortgages against this property. The first of these was a home equity loan held by Provident Savings Bank for $9,000 which was taken when the Debtor installed an in-ground swimming pool in her backyard. Baccaglini referenced the absence of this mortgage under the sections of the June and July personal financial statements entitled "Real Estate Mortgages." On cross-examination, Baccaglini acknowledged that the loan appeared on the July statement under the heading "Loans Outstanding" and indicated that it was secured. Baccaglini further conceded that he did not consider this to be an error since he himself would likely not have listed the home equity loan under real estate mortgages. The second mortgage was given to Anthony Pennes, the Debtor's father-in-law, as security for a loan to both the Debtor and her husband in the sum of $26,-000. At trial, it was established that this

mortgage, to the extent it exists, was not given until July of 1993, one year after the personal financial statements were submitted by the Debtor to EAB. The Debtor testified that she never saw the mortgage, note or check, but she was told by her husband that they received the funds from her father-in-law. No other evidence of this mortgage was produced by either EAB or the Debtor.

■ At most, pursuant to the language on EAB's standard form financial statement, the Debtor had a duty to update EAB about the existence of a new mortgage on the Debtor's property. However, as EAB well knew from its communications with IEMG and its principals, as shown in internal EAB memoranda, (EAB's Ex. D & E), by that time IEMG had stopped operating, defaulted and was considering bankruptcy. Therefore, I find that the omission of the third mortgage is not a material falsity because it was not in existence, if at all, until approximately one year after the Debtor submitted her personal financial statements to EAB, and cannot form the basis of a section 523(a)(2)(B) violation.

*Finally,* EAB introduced evidence that the Debtor misrepresented the value of the Glen Head property on her personal financial statement when she claimed it had a market value of $385,000. The Debtor testified that she purchased the Glen Head property in 1987 for $340,000; no contract of sale was produced by the Debtor, nor was there any other evidence produced to support the alleged purchase price. She also testified that since that time she made improvements to the property including installation of a deck, central air-conditioning, in-ground swimming pool, refinishing of wood floors and carpeting the home which she estimated to cost $40,-000–$45,000. No evidence was offered to support this allegation except for the $9,000 home equity mortgage. In her bankruptcy petition, dated December 2, 1993 but filed January 28, 1994 approximately 1½ years after the financial statement was made, the Debtor stated the market value of the Glen Head property to be $275,000 based on a "letter of market value" from a Century 21 real estate agent—a decrease of one-hundred ten thousand ($110,000) dollars. An appraisal conducted by Ray Brower, at the request

of EAB, prepared on October 13, 1995, estimated the fair market value of the real property as of June 24, 1992 to have been $270,-000. The appraisal was based on an exterior examination of the Glen Head property only, but relied on the comparable sales comparison method of valuation. Brower testified that in his view, the real estate market on Long Island had remained "relatively flat or stable" during the relevant time period in question—the late 1980s and early 1990s. The Debtor did not conduct a formal appraisal at any time to determine the approximate value of her home. Based on these facts, EAB asserts that the Debtor overstated the value of her Glen Head property (and thus, her net worth) at the time of submitting her financial statement to EAB, by as much as $110,000. The Debtor presented no supporting evidence to sustain the validity of the market value she placed on her personal financial statement. It appears to be a mere guess by the Debtor, or at best, a lay person's estimate without any factual support.

■ This Court finds that the Debtor's July personal financial statement was materially false as to the value of the Debtor's residence. A materially false statement is a statement that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally effect the decision to grant credit." *In re Erdheim,* 180 B.R. 42, 45 (Bankr.E.D.N.Y.1995) (citing *In re Nance,* 70 B.R. 318, 321 (Bankr.N.D.Tex.1987)). Materiality is to be determined by comparing the Debtor's actual financial condition with the picture painted by the Debtor's representations. *Id.* In evaluating whether a false statement is material, the core inquiry is "whether the lender would have made the loan had he known the debtor's true financial condition." *In re Erdheim,* 180 B.R. 42, 45 (Bankr.E.D.N.Y.1995) (citing *In re Bogstad,* 779 F.2d 370, 375 (7th Cir.1985)). This prong of section 523(a)(2)(B) requires more than a simple incorrect or erroneous statement. *In re Brown,* 55 B.R. 999, 1003 (Bankr.E.D.N.Y.1986).

An examination of EAB's appraisal shows the materiality of the Debtor's mis-valuation of the Glen Head property. Brower testi-

fied, as his appraisal details (EAB's Ex. F), that he conducted his appraisal using the comparable sales comparison method of valuation. This Court believes this to be the only applicable method for this case. He compared four residential properties in order to value the Debtor's Glen Head property. Because there was a limited number of sales of similar style homes within the immediate area of the Debtor's property and within 6 months prior to or after mid–1992, when the Debtor valued her property, Brower expanded the comparable time frame. Comparable sale number two, which was on the same street as the Debtor's property and was the same colonial style home as the Debtor's was sold in May, 1991, just one year prior to the Debtor's valuation, for $245,000. Brower stated that after he adjusted the price, to account for difference between the subject property (the Debtor's Glen Head property) and the comparable property, that sale number two would be valued at $266,750. Moreover, comparable sale number three, the same colonial style house as Debtor's property, was sold in August, 1992 for $247,000. This home sale, even closer in time to the Debtor's valuation, was one block away from the Debtor's property. After the appropriate adjustment, sale number three was valued at $265,900.

Significantly, the highest sale price of any of the comparables, three of which were the same colonial style home as the Debtor's residence, was $260,000, in June, 1993, one year after the Debtor valued her property at $385,000. After the net adjustment, the highest valuation of any of the comparables as compared to the Debtor's residence, was $282,000. Notably, all four of the comparable sales fall within the range $250,000 to $260,000, and after valuation adjustment the fair market value would have been $263,000 to $282,000—very close to EAB's valuation. Even though Brower conceded that the Debtor's home was superior to the comparables, he emphasized that all of the comparables were in good condition and were of the same utility and liveability. The Debtor did not present any appraisal or other evidence to refute this testimony and the evidence introduced.

## DISCUSSION

██ Bankruptcy Code section 523(a)(2)(B) excepts from discharge certain debts incurred by use of a false written statement about a debtor's financial condition. This section provides that a particular debt is not dischargeable if the money, property, services or credit which constitute the debt were obtained by:

(B) use of a statement in writing—

 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;

 (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

 (iv) that the debtor caused to be made or published with intent to deceive;

 . . . .

11 U.S.C. § 523(a)(2)(B). The burden of proof to sustain an objection to discharge rests on the plaintiff. *See In re Balzano,* 127 B.R. 524, 530 (Bankr.E.D.N.Y.1991); Rule 4005, Fed.R.Bankr.P. In order for a creditor to meet its burden to obtain an exception to discharge, the creditor has the burden of proof by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Exceptions to discharge under section 523(a) are to be literally and strictly construed against the creditor and liberally in favor of the debtor. *In re Bodenstein,* 168 B.R. 23, 27 (Bankr.E.D.N.Y.1994).

In this case, the requisite written statement is the July 1992 personal financial statement submitted by the Debtor to EAB in connection with IEMG's application for a line of credit and the Debtor's personal guaranty for that credit. As stated above, this personal financial statement was required and provided to EAB before a line of credit was extended in IEMG's favor, and with an express acknowledgement by the Debtor that EAB intended to rely upon its truthfulness.

### 1. Materiality

██ Once EAB made a *prima facie* showing of a material misrepresentation by

the Debtor—an inflated valuation—the burden shifted to the Debtor to rebut this evidence. The Debtor has failed to do so. The Debtor produced no evidence, other than her own testimony, as to the value of her home when she purchased it in 1987. She did not produce the contract of sale to the Glen Head property, nor did she produce any receipts or documentation showing the alleged improvements to the property since 1987. The Debtor never bothered to conduct her own appraisal, to refute Brower's appraisal, even after it was apparent that the value of the property was a critical issue in this case. Finally, I point out that EAB's appraisal at $270,000 and Century 21's valuation at $275,000 as of the date of the petition are strikingly similar and both applied to the time frame of mid–1992 to the end of 1993.

Section 532(a)(2)(B) speaks of a materially false statement. However, because, as Baccaglini testified at trial, the Debtor's sole major asset was her Glen Head property, any misstatement as to the value of this residence has a material impact on the Debtor's personal financial statement as a whole. In this regard, the case of *In re Valley,* 21 B.R. 674 (Bankr.D.Mass.1982) is instructive. In *Valley,* the Debtors overstated the value of their home by $15,000, thus increasing their net worth from $11,465 to $26,465. *Id.* at 680. The Court in that case concluded that such a misrepresentation by the Debtors rendered their financial statement materially false and further that the bank acted reasonably in relying upon the statement. *Id.*

Here, the case is very much the same. The Debtor's net worth was reflected as $140,700 and $146,000 on the June statement and July statement respectively where the value of the Glen Head property is listed as $385,000. Thus, the equity in the Glen Head property based on the two personal financial statements was represented to be $136,000 ($385,000 minus the two mortgages encumbering the property represented as $249,000).

If the market value of the property was in fact approximately $270,000–$275,000, the Debtor's equity in the Glen Head property shrinks to just $21,000–$26,000. Even if the Glen Head property was valued at $300,000,

(although there is no evidence to support this) the Debtor's equity in the property would be approximately $51,000, substantially less than the $136,000 of equity value claimed by her on the June and July financial statements. This Court finds the Debtor's representation of the market value of her property to have been a material false statement.

The Debtor's representation as to the value of the Glen Head property paints a substantially untruthful picture of this Debtor's financial condition. Essentially, except for some minimal personal assets, the entire net worth of the Debtor was attributable to the purported equity in the Glen Head property which she valued at $385,000. This was the Debtor's sole major asset, the value of which significantly affected EAB's decision to grant the line of credit.

### 2. Reasonable Reliance

The issue of whether EAB's reliance was reasonable in these circumstances deserves closer scrutiny. Courts have adopted an objective standard in determining whether reliance is reasonable, focusing on the degree of care exercised by the plaintiff, given the circumstances of the business transaction. *In re Forman,* 181 B.R. 22, 26 (Bankr.E.D.N.Y.1995) (citing *In re Reisman,* 149 B.R. 31, 38 (Bankr.S.D.N.Y.1993) (internal citation omitted)). The court must consider the "totality of the circumstances" involved in the case. *In re Erdheim,* 180 B.R. 42, 46 (Bankr.E.D.N.Y.1995) (citing *In re Young,* 995 F.2d 547 (5th Cir.1993)). Even partial reliance by a creditor on a false financial statement may be sufficient for a section 523(a)(2)(B) violation. *In re Boice,* 149 B.R. 40, 46–47 (Bankr.S.D.N.Y.1992). A plaintiff must have actually relied on the misrepresentations. *In re Forman,* 181 B.R. 22, 26 (Bankr.E.D.N.Y.1995); *In re Wiener,* 144 B.R. 17, 21 (Bankr.E.D.N.Y.1992).

This Court considers the mere fact that the personal financial statements were requested from the Debtor and her co-principals at IEMG as a prerequisite to the establishment of a line of credit and acceptance of personal guarantees, as patently indicative of EAB's intention to rely on the stated infor-

mation and further, that the Debtor was clearly aware of EAB's reliance upon this very same information. Additional evidence of EAB's intended reliance on the Debtor's July personal financial statement is readily apparent from EAB's request to the Debtor to re-submit her June statement on EAB's standard form which contained the following reliance language:

> The undersigned understands that you [EAB] are relying on the information provided herein (including the designation made as to ownership of property) in deciding whether to grant or continue credit. The undersigned represents and warrants that the information provided is true and complete and that you may consider this statement true and correct until written notice of a change is given to you by the undersigned.

Further, Gerard Baccaglini testified at trial that EAB did indeed rely on the financial information contained in the July personal financial statement. He made clear that the entire purpose of the personal financial statements was to assess personal financial stability, as well as to examine the Debtor's net worth. His testimony demonstrated that EAB either would not have approved the line of credit had the bank been aware of the Debtor's true financial condition, or, at a minimum, would have reduced the amount of the credit line or required additional collateral. This is especially true, where, as with IEMG, the borrower was a "start up" company. It was sufficiently prudent for EAB to require the Debtor to submit her personal financial statement on a standard form containing clear language stating EAB's reliance, as well as to seek personal guarantees from the Debtor and her co-principals at IEMG prior to extending credit.

EAB's objective reliance is not destroyed by its failure to verify the information supplied to the bank by the Debtor. Courts have deemed a creditor's reliance on a debtor's financial statement to be reasonable, even where the creditor failed to take steps to verify the information. *In re Erdheim*, 180 B.R. 42, 46 (Bankr.E.D.N.Y.1995) (citing *In re Ashley*, 903 F.2d 599 (9th Cir.1990)). While a formal appraisal of the Glen Head

property at the time of the loan application, either by the Debtor at EAB's direction, or by EAB itself, would have been preferred, the lack of this appraisal is not fatal to EAB's reliance. Baccaglini stated that it is not the general practice of EAB to conduct an appraisal, unless the bank takes a mortgage as security for the loan, which it did not do in this case.

In addition, in this case there were no "red flags" to alert EAB that the information contained in the Debtor's financial statement was incorrect. *In re Hough*, 111 B.R. 445, 450 (Bankr.S.D.N.Y.1990); *see In re Erdheim*, 180 B.R. 42, 47 (Bankr.E.D.N.Y.1995) (no "red flags" putting plaintiff on notice about possible misrepresentations). This Court is satisfied from its review of the evidence that EAB's reliance was reasonable and thus, rejects the Debtor's argument that EAB did not reasonably rely on the July financial statement because it did not verify the information contained therein. There is nothing in the record which suggests that EAB's reliance on the July personal financial statement was unreasonable.

The Debtor's assertion that EAB's request for a personal financial statement from her was designed not as a means to examine her fiscal condition but instead as a "tool upon which EAB would object to her discharge in the event of a default" is without merit as it is not supported by the evidence. First, this argument assumes that somehow EAB possessed the foresight to know that IEMG and its principals would default and that EAB wanted to use the financial statement as a weapon in the event of a default. There is no doubt that the standard of reasonable reliance should foster a considered use of solicited financial statements and discourage the " 'spurious' use of such statements which are obtained primarily with a view to the exception to discharge" if a debtor does indeed default and file in bankruptcy. *In re Boice*, 149 B.R. 40, 47 (Bankr.S.D.N.Y.1992) (quoting *In re Magnusson*, 14 B.R. 662, 668–69, n. 1 (Bankr.N.D.N.Y.1981)). I find, however, that the Debtor in this case has not demonstrated that EAB intended to use the financial statement for any purpose except the purpose for which it was requested.

EAB was entitled to receive personal financial statements and guaranties from the guarantors to assure it that the money loaned to the borrower, a start up business, would be repaid either by the borrower or by its guarantors. Had the Debtor provided an honest and accurate statement, it could not have been used to bar the discharge of this debt.

Debtor's further argument, suggesting that EAB was required to investigate independently the Debtor's financial information, ignores the fact that EAB was entitled to rely on the language in its statement alerting the Debtor that it would rely on the accuracy of the statements. It was not required to investigate the veracity of the guarantors, where there was nothing to indicate that further inquiry would be prudent.

The Debtor places much emphasis on the case *In re Bogstad*, 779 F.2d 370 (7th Cir. 1985). *Bogstad* involved allegations of misrepresentation on a financial statement and a section 523(a)(2)(B) action. The Seventh Circuit held, quite differently from the case at bar, that the financial statement had not been proved materially false because the loan in question would have been made even if the debtors were worth less than they represented on their financial statement. *Id.* at 375. The facts in this case do not warrant the same conclusion since there is no evidence to support a finding in this case that the loan in question would have been made even if the Debtor was worth less than as represented. Further, in *Bogstad*, the lender undertook no investigation at all to verify information because of a *familiarity with the borrowers*. *Id.* at 373 n. 4. Here, IEMG was only recently formed, and had no financial history. EAB did not have prior financial knowledge of the guarantor, and did rely on the Debtor's financial statement. Thus, the *Bogstad* dicta is not relevant here.

### 3. Intent to Deceive

■ This Court is convinced by a preponderance of the evidence that the Debtor signed her July personal financial statement and provided it to EAB with intent to deceive. It is quite obvious from the facts of this case that this Debtor made representa-tions which were at the very least reckless and were not an accurate portrayal of her financial condition. Indeed, most telling about this Debtor is her conduct to deceive EAB about the value of the Glen Head property.

At an earlier deposition of the Debtor conducted by EAB's attorney on December 14, 1994, ten months prior to the trial, the following exchange occurred between EAB's lawyer and the Debtor:

Q: How did you determine the value of the real estate at 34 Smith Street?

A: I don't remember.

Yet at trial, the Debtor listed several purported factors which led her to believe that her residence was valued at $385,000. Among the factors were (1) discussions with neighbors and friends who were real estate agents, (2) her own experience from selling a prior home, and absurdly enough, (3) homes sale advertisements in the "Pennysaver", a Long Island newspaper containing employment ads and listings for houses for sale. The Debtor further testified that she and her husband felt they were being conservative when they arrived at the $385,000 figure. During cross-examination EAB's attorney asked the Debtor about her suddenly improved recollection and the Debtor testified, that she was nervous at the deposition and while she knew this matter was very important, she was not aware at the deposition that the alleged inflated value of her home was an issue in the case. Incredibly, and contradicting her earlier testimony on direct examination, the Debtor admitted on cross-examination that she did not specifically look at the "Pennysaver" and other newspaper ads as a reference to determine the value of her home. Rather, she testified that she was just curious about the prices of homes sold in her neighborhood. Even if the Debtor were speaking truthfully, the listings in newspapers for home sales indicate only the "asking price" and not the price at which a house actually sold. Finally, the Debtor conceded that she had no independent knowledge of the trend in real estate prices on Long Island from 1987 to 1992 but was told that property had devalued.

When it came to filling out her bankruptcy petition, the Debtor was much more precise about the value of the Glen Head property. She sought and received a written "letter of market value" from a local Century 21 real estate broker as to the value of the Glen Head property. This letter, which was obtained a short time before the Debtor completed her bankruptcy petition dated December 2, 1993, was not a formal appraisal. The Century 21 broker valued the property at $275,000.

Quite simply, this Court does not credit the Debtor's explanation concerning the method by which she valued her Glen Head property. Although it is clear that the Debtor made some type of lay person's estimate as to the value of the property, her flawed valuation was, in all probability, substantially inflated and her veracity was severely challenged in the eyes of this Court by her inconsistent testimony, and lack of evidence to support her estimated valuation. The Debtor offered no actual proof, other than her own testimony, about how she arrived at the estimate for the value of the Glen Head property. She testified that she simply added the approximate value of improvements (about $40,000) made to her home to the purchase price ($340,000) she paid in 1987 to arrive at the figure of $385,000 reflected in her financial statements. She did not offer the testimony of the people she says she consulted in arriving at this value. Nor did she present any documentary evidence which showed how she calculated the value. Given the circumstances, it is difficult for this Court to believe that the Debtor's valuation was truthful.

The law does not require direct proof of an intent to deceive. Rather, such intent may be inferred from the surrounding circumstances of the case. *In re Bodenstein*, 168 B.R. 23, 29 (Bankr.E.D.N.Y.1994). The requisite intent may also be inferred from a sufficiently reckless disregard for the accuracy of the facts. *Id.* (citing *In re Black*, 787 F.2d 503, 506 (10th Cir.1986)). Intent to deceive can be inferred where the debtor knew or should have known of the falsity of the statement. *In re Bodenstein*, 168 B.R.

23, 29 (Bankr.E.D.N.Y.1994); *In re Boice*, 149 B.R. 40, 47 (Bankr.S.D.N.Y.1992).

Finally, this Debtor is an experienced businesswoman who has been in the marketing and advertising industry in various positions during her entire working life. Common sense and business acumen dictate that something more accurate than a rough estimate be provided on a financial statement in connection with a credit application for the sum of $300,000. Given the flat real estate market in this part of the country during the last few years, (as EAB's expert appraiser testified) it would have been wise for the Debtor to confirm the alleged appreciated value of her Glen Head property by a more accurate reference than the "Pennysaver" or opinions of her neighbors. Not having done so, it was necessary, at trial, for the Debtor to substantiate her estimate of market value by some concrete evidence or independent professional testimony. None was presented.

## CONCLUSION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Based upon the discussion set forth above, the Debtor violated section 523(a)(2)(B) of the Code by making, with an intent to deceive, a materially false statement about her financial condition in her written personal financial statement which EAB reasonably relied upon.

The debt of $319,479.03 is deemed non-dischargeable.

SETTLE AN ORDER in accordance with this Decision.